KNOX COUNTY EDUCATION
ASSOCIATION, Plaintiff–
Appellee,

v.

KNOX COUNTY BOARD OF
EDUCATION, Defendant–
Appellant.

Nos. 97–5405, 97–5408.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1998.

Decided Sept. 29, 1998.

Jeremiah A. Collins (argued and briefed), Alice Margaret O'Brien (briefed), Bredhoff & Kaiser, Washington, DC, Richard L. Colbert (briefed), Cornelius & Collins, Nashville, TN, for Plaintiff-Appellee-Cross-Appellant.

Mary A.R. Stackhouse (briefed), Knoxville, TN, John E. Owings (argued and briefed), Knoxville, TN, for Defendant-Appellant-Cross-Appellee.

Before: NELSON and RYAN Circuit Judges; ROSEN, District Judge.

## OPINION

ROSEN, District Judge.[*]

### I. INTRODUCTION

This appeal raises challenging and far-reaching constitutional questions concerning drug testing of teachers and other personnel in our nation's schools. Not only are a number of the issues presented here of first-impression for our Circuit, but these issues call upon us to consider and reconcile important constitutional and societal values concerning the environment in which our children are educated. Because the law in this area is unsettled and the issues of significant import to our schools and communities, the Court examines these important questions in some detail and at some length.

### II. BACKGROUND & PROCEDURAL HISTORY

Plaintiff Knox County Education Association ("KCEA"), which represents professional employees in the Knox County School System, initiated this action to challenge drug and alcohol testing procedures adopted by Defendant Knox County Board of Education ("Board"), which is the body responsible for the administration, management, and control of the Knox County School System. In the District Court, KCEA made a facial attack on the Board's "Drug-Free Workplace Substance Abuse Policy," seeking declaratory and injunctive relief. The policy establishes, *inter alia,* two different levels of testing: (1) suspicionless drug testing for all individuals who apply for, transfer to, or are promoted to, "safety sensitive" positions within the Knox County School system, including teaching positions; and (2) "reasonable suspicion" drug and/or alcohol testing of

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

all school employees. KCEA challenged both testing programs as violative of the Fourth Amendment's prohibition against unreasonable searches and seizures.

In response, the Board twice moved for summary judgment on the basis that certain positions in the Knox County School system had already been ruled to be "safety sensitive" as a matter of law in a previous decision rendered in litigation challenging an earlier version of the Policy. See, *Knox County Education Association v. Knox County Board of Education*, No. CIV 3–91–72 (E.D. Tenn. April 13, 1994) ("KCEA I"). Defendant argued, as it argues on appeal, that KCEA I was binding in this matter through the application of the doctrines of res judicata and collateral estoppel, and that the new Policy, which was carefully drafted to conform with the requirements for constitutional drug testing enunciated in KCEA I, must be found constitutional. United States District Judge James H. Jarvis denied the motions, finding the language in KCEA I regarding safety sensitive positions dictum. The Board moved for summary judgment a third time, and moved that the District Court take judicial notice of the finding in KCEA I. The District Court predictably denied this motion as well.

The matter was tried on November 12, 1996. In an Opinion and Order dated March 4, 1997, the District Court found that the Board's drug testing policy violated the Fourth Amendment to the extent that (1) it permitted any suspicionless drug testing; and (2) in the manner by which it permitted alcohol testing upon reasonable suspicion. The District Court enjoined the Board from further implementation and enforcement of those sections of the Policy, and found the remainder of the policy facially valid.

This matter is now before the Court on the cross-appeals of the parties.

## III. FACTS

### A. Knox County School System

The Knox County School system is comprised of eighty-eight schools, fifty-three of which are elementary schools and thirty-five of which are middle or high schools. Fifty-three thousand students attend the Knox County Schools, roughly half of whom are elementary school students and half are middle or high school students.

Thirty-two hundred teachers are employed in the Knox County Schools. According to the Director of Personnel Betty Sparks, a typical day's work for an elementary school teacher revolves around the students in his or her classroom. Elementary school teachers plan for, instruct, and supervise the children in their classroom during the school day. In addition, teachers supervise children coming and going to school, and monitor them in the hallways and cafeteria.

Similarly, the duties of a high school teacher revolve around teaching his or her classes. A high school teacher typically spends six hours of each school day either instructing students or preparing to do so. During the remainder of the school day, high school teachers monitor the hallways when students are changing classes, and may assume other supervisory duties on a volunteer basis.

The Knox County Schools are also staffed by a number of non-teaching professionals who are trained to address the physical and psychological health and safety needs of the students, including nurses, social workers, educational diagnosticians, occupational therapists and physical therapists. To respond to violence or other illegal activity that might occur in or around the schools, Knox County has a Department of School Security comprised of a Chief of Security, four law enforcement investigators, and twenty-four armed, uniformed security officers. One security officer is assigned to each high school, and the remainder of the officers respond to reported incidents at any school.

According to Chief of Security Stephen Griffin, even in those schools where there is a uniformed officer, the majority of information concerning students' behavior comes to the attention of security officers through the observations of the principal or teachers. (J.A. 1122). Griffin testified as follows at trial:

Q. Mr. Griffin, since you do not have security officers for every school, are teachers and principals at the schools important to school security? And if so, why?

A. Most definitely. They are the front-line of security as far as the schools are concerned. Even in schools where there is a uniformed officer, the majority of information generated to our office is initiated through a principal or administrator.

(J.A. 937). Furthermore, Director of Personnel Betty Sparks testified that detecting drug use and the possession of a weapon is among teachers' responsibilities. (J.A. 890). Ms. Sparks testified that as a teacher "it is vitally important for [her] to be on [her] toes every minute with every youngster [she] is working with." (J.A. 887).[1]

The Security Department reports all incidents, whether criminal or not, that implicate the safety and security of students or staff. The incident reports for 1995–96 school year did not report any unlawful or violent conduct in the fifty-three elementary schools. The records reflect thirty-four assaults on students at the thirty-five middle and high schools, and fourteen assaults on teachers or principals (with no incidents occurring at all in twenty schools). There is no evidence that a pronounced drug/alcohol abuse problem exists among the Knox County teachers[2], nor is there evidence that the inattentiveness or negligence of a teacher has ever contributed

to, or was related in any way, to these assaults or to any security incident.

With respect to non-violent but unlawful conduct, the Board's records indicate that during the 1995–96 school year, thirty-five students were charged with the possession of a weapon[3] and seventy-four were charged with the possession or use of alcohol or drugs.[4] Again, there is no record evidence that a teacher has ever failed to report a student for the use or possession of drugs, alcohol, or weapons.[5]

## B. Prior Litigation Over the 1991 Drug Testing Policy

In December of 1989, the Board adopted a "Drug–Free Workplace Policy," which was then revised several times over the course of the next two and a half years. In 1991, KCEA filed suit challenging the policy on Fourth Amendment grounds.

In that case, the district court, Judge Jordan presiding, noted that the policy did not describe the methods or procedures to be followed in obtaining or testing urine samples, nor did it assure the employee applicants that their privacy interests in the results would be protected. This led the court

---

1. This viewpoint was articulated by other Knox County School administrators as well, including Henrietta Grant, a principal of one of the schools. When asked for the reasons that Knox County needs a drug-free workplace policy in schools that includes teacher testing, Ms. Grant testified:

 I think that my kids are the most important things in our lives, and that we should be as clear-headed as we can be when we're working with those students. I think that we're responsible for them. And I don't feel that the teachers, anybody who works in the school should not be clear-headed and clear-thinking when they're working with them.

 (J.A. 953–54). When asked why clear-headedness is important for teachers and principals, she testified:

 Well, for many reasons. Safety: I would not want a person working with a child whose reaction time had been .... thrown off with a substance. I think that it's true that you react differently when you're clear-headed as opposed to when you're not clear-headed, and I would hope that all of my teachers would be able to act as quickly and as .... they'd be able to act in such a manner that would protect the children if that were called for.

 (J.A. 954).

2. The Board claims, however, that research indicates that twenty-five percent of the population uses dangerous drugs and that many have used drugs on the job. During the cross-examination of Ms. Sparks at trial, the District Court stated that there was no reason to believe that teachers are different from any other profession.

3. Twenty-eight weapons were recovered, nineteen of which were knives.

4. Of these, forty-four of the incidents involved the use of marijuana.

5. According to the Board, the 1995–96 school year was actually more calm than the preceding three years. In the 1992–93 school year, there were sixty-one assaults by students on students and seventeen assaults on teachers; in the 1993–94 school year, there were sixty-eight assaults by students on students and nine assaults on teachers; in the 1994–95 school year, there were forty-four assaults on students and seven on teachers.

to conclude: "Because the privacy interests of the professional employee applicants in this case are not protected at all by the policy as it is written, the court finds that for this reason alone the policy must fail constitutional examination." (J.A. 282).

The court did not end its inquiry at that point, however. The court addressed the second part of the balancing test to examine whether the governmental interests were strong enough to test all professional employees, irrespective of the nexus their position had to the safety of the children. The court then found that of the professional employee positions subject to pre-employment drug screening, principals (and assistant principals), teachers (and traveling teachers), teacher aids, and school secretaries occupied safety sensitive positions because "[a]ny lapse in attention or judgment on the part of these employees could result in an immediate threat to a child's safety." (J.A. 284–85). This led the court to conclude:

> Thus, even if the policy adequately protected the privacy interests of the professional employees, and the court finds that it does not, the only professional employees which the court considers subject to pre-employment testing are principals, assistant principals, teachers, traveling teachers, teacher aids, and school secretaries.

(J.A. 287). In the instant litigation, a crucial issue is whether teachers are "safety sensitive" employees—a question which the Board claims has already been resolved by KCEA I.

## C. 1994 Drug Testing Policy

On June 1, 1994, in response to Judge Jordan's decision, the Board of Education met in regular session and voted to adopt the "Drug–Free Workplace Substance Abuse Policy" for implementation in the Knox County School system. As adopted, the Policy establishes a comprehensive drug and alcohol testing program for the Board of Education's employees. The Policy notes that the Federal Anti–Drug Act, 41 U.S.C. § 702, requires federal grant recipients, such as the

Board, to establish a drug-free workplace. The Policy describes its goals and objectives as follows:

1. To establish, promote, and maintain a safe, healthy, working and learning environment for employees and students.

2. To aid the affected employee in locating a rehabilitation program for employees with self-admitted or detected substance abuse problem.

3. To promote the reputation of the Knox County School System and its employees as responsible citizens of public trust and employment.

4. To eliminate substance abuse problems in the workplace.

5. To aid in the reduction of absenteeism, tardiness, and apathetic job performance.

6. To provide a clear standard of job performance for Knox County Schools employees.

7. To provide a consistent model of substance-free behavior for students.

(1994 Policy, J.A. 1006–1007).[6]

The Policy divides the tested employees into two distinct groups: (1) those who may be the subject of suspicionless testing (those who may be tested pre-employment for "safety sensitive" positions, pre-transfer for "safety sensitive" positions, and upon return to duty after undergoing rehabilitation); and (2) those who may be tested for reasonable suspicion of drug or alcohol impairment while at work (all employees).

The substance abuse policy prohibits any Board of Education employee from being under the influence of an illegal drug or alcohol while on duty, on Knox County Board of Education property, or in attendance at a System-approved or school-related function.

### 1. Suspicionless Testing

The Policy allows suspicionless testing for people applying for positions that are "safety

---

6. Despite the multifaceted aims of the Policy, the District Court found that "it is clear from the trial of this case that the primary policy consideration the Board of Education is concerned with is the safety of the students entrusted to it; that

is, that a student might be injured because of the inattentiveness or negligence of a drug or alcohol impaired teacher or other employee having responsibility for the student." (J.A. 39).

sensitive." The Policy defines "safety sensitive" positions as those positions "where a single mistake by such employee can create an immediate threat of serious harm to students and fellow employees." (J.A. 1007). According to the Policy, and consistent with the ruling in KCEA I, this category includes principals, assistant principals, teachers, traveling teachers, teacher aides, substitute teachers, school secretaries and school bus drivers.

Applicants for these positions are tested after they are offered a job but before their employment has commenced (i.e., post-offer, pre-employment). They are to be given a copy of the Policy in advance of the physical and are to sign an acknowledgment prior to substance screening, permitting the summary result to be transmitted to the Medical Review Officer ("MRO") and Director of Personnel. An applicant refusing to complete any part of the drug testing procedure will not be considered a valid candidate for employment with the school system, and such refusal will be considered as a withdrawal of the individual's application for employment. If substance screening shows a confirmed positive result for which there is no current physician's prescription, a second confirming test may be requested by the MRO. If the first or any requested second confirming test is positive, any job offer will be revoked.

Current employees attempting to transfer into safety sensitive positions—including those who already hold such positions—are also tested. Employees who test positive for illegal drugs on a promotion/transfer test will no longer be considered an applicant for that position. Employees seeking a transfer or promotion who refuse any portion of the drug testing procedure forfeit the opportunity to transfer to, or advance into, a safety sensitive position and are subject to discipline for insubordination (including termination).

### 2. Reasonable Suspicion Testing

Section .05 of the Policy provides for drug and/or alcohol screening based upon reasonable suspicion as follows:

Whenever the Knox County Board of Education, through its Director of Personnel or the person authorized to act as the Director in the Director's absence, and/or the Medical Review Officer, reasonably suspects that an employee's work performance or on-the-job behavior may have been affected in any way by illegal drugs or alcohol, or that an employee has otherwise violated the Knox County Board of Education Drug–Free Workplace Substance Abuse Policy, the employee may be required to submit a breath and/or urine sample for drug and alcohol testing. When a supervisor observes or is notified of behavior or events that lead the supervisor to believe that the employee is in violation of the Drug–Free Workplace Substance Abuse Policy, the Supervisor should notify the Director of Personnel.

An employee who is required to submit to drug/alcohol testing based upon such reasonable suspicion and refuses will be charged with insubordination and [subject to the disciplinary sanctions, including possible termination].

(J.A. 1010).

Further, an employee testing positive on a reasonable suspicion test will be found to be in violation of the Policy, and such a violation will constitute grounds for termination. The Policy notes that the School System Director of Personnel, or the person authorized to act in that person's absence, or the MRO are the only individuals in the Knox County School System authorized to make a determination that reasonable suspicion, or cause, exists to order a drug screen, and are the only individuals in the School System who may order an employee to submit to a drug screen.

The Policy describes two types of cases for which the reasonable suspicion procedures may be invoked:

(1) Chronic case

Deteriorating job performance or changes in personal traits characteristics where the use of alcohol or drugs may be reasonably suspected as the cause. These cases may develop over a fairly long period of time.

(2) Acute case

Appearing in a specific incident or observation to then be under the present influence of alcohol and/or drugs is reasonably sus-

pected to be a contributing cause. Regardless of previous history, immediate action is necessary.

(J.A. 1011).

The Policy further enumerates the circumstances under which substance screening may be considered, which include, but are not limited to, the following:

1. Observed use, possession, or sale of illegal drugs and/or use, possession, sale, or abuse of alcohol and/or the illegal use or sale of prescription drugs.

2. Apparent physical state of impairment of motor functions.

3. Marked changes in personal behavior not attributable to other factors.

4. Employee involvement in or contribution to an accident where the use of alcohol or drugs is reasonably suspected or employee involvement in a pattern of repetitive accidents, whether or not they involve actual or potential injury.

5. Violations of criminal drug law statutes involving the use of illegal drugs, alcohol, or prescription drugs and/or violations of drug statutes.

(J.A. 1011). The above circumstances under which substance screening may be considered "are strictly limited in time and place to employee conduct on duty or during work hours, or on or in Knox County Board of Education property, or at school system-approved or school related functions." (J.A. 1011).

### 3. Testing Procedures

Section.11 of the Policy describes the drug and alcohol abuse testing procedures. The Board has designated a physician as the MRO. The MRO is responsible for reviewing the results of drug tests before they are reported to the Board's Director of Personnel; reviewing and interpreting each confirmed positive test to determine if there is an alternative medical explanation for the

positive result; conducting an interview with the individual testing positive; reviewing the individual's medical history and medical records to determine if the positive result was caused by legally prescribed medication; requiring re-test of the original specimen if the MRO deems it necessary; and verifying that the laboratory report and the specimen are correct. The MRO is expected to follow the Medical Review Officer's Manual published by the U.S. Department of Health and Human Services. However, if the MRO determines that there is a legitimate medical explanation for the positive test other than the use of a prohibited drug, the MRO will conclude that the test is negative and take no further action. If the MRO concludes that a particular test is scientifically insufficient, the MRO will conclude that the test is negative for that individual. If the MRO determines that there is no legitimate explanation for the positive test other than the use of a prohibited drug, the MRO will communicate the test results as positive to the Director of Personnel.

In the case of drug testing, urine specimens are to be collected in accordance with Department of Transportation Workplace Testing Programs, 49 C.F.R. part 40, with some exceptions. Procedures for collecting urine specimens shall allow privacy unless there is reason to believe that a particular individual may alter or substitute the specimen.[7] The initial test performed on the urine at the laboratory will be an Enzyme–Multiplied Immunoassay Technique (EMIT) screen which will be used to eliminate negative urine specimens from further consideration. All specimens identified as positive on the initial test will then be confirmed using gas chromatography/mass spectrometry (GC/MS) techniques.

With respect to the alcohol testing procedures, the Policy provides only that the Knox County Sheriff's Department will be requested to perform, and will be responsible for administering, a breath analysis test.[8] If the

---

7. Unlike the D.O.T. testing procedures, the Knox County Policy specifies four examples in which reasonable cause exists, but the list is only illustrative. Under the D.O.T procedures, direct ob-

servation is only permissible in one of four specifically delineated circumstances.

8. At trial, however, the Director of Personnel testified that the breathalyzer test is now admin-

breath analysis test is positive, a second breath analysis may be taken. The breath analysis test level to be considered positive will be .02. The alcohol urinalysis will be an EMIT screen followed by confirmatory gas chromatography tests on positive screens. Either test will be considered positive if the results are .04 or more. In contrast to the D.O.T. procedures—which contain detailed regulations concerning training for individuals who administer breathalyzers, standards for breathalyzer machines, and standards for administering the initial test—the Policy provides few guidelines regarding the administration of a breathalyzer test.

Procedurally, the Policy describes the reasonable suspicion testing as follows:

Once the determination has been made that an employee is to be tested based upon reasonable suspicion, the Director of Personnel should then transport the employee to the collection site, or make other appropriate arrangements for transportation. The collection site personnel should be notified that the reason for testing is reasonable suspicion.

Upon arriving at the collection site, the employee will be asked to sign a release for testing and to assist in completing the necessary forms for testing. After the employee has signed the necessary releases for testing, then the standard procedures for drug and alcohol testing should be followed by the collection site personnel.

Once the procedure has been completed, the employee should be transported back to the Director of Personnel's office where the employee will be placed on administrative leave with pay until the results of the tests are available and given instruction to call the Director of Personnel each work day, before the normal reporting time for that employee, for further instructions.

If the employee refuses to sign the release or refuses to be tested by NPL, the employee should be advised that refusal under the Board Policy is insubordination. If the employee continues to refuse, the employee should be transported back to the Director of Personnel's office. The Director of Personnel will place the employee on administrative leave with pay with instructions to call his/her office before the normal reporting time for that employee on the following work day.

If Director of Personnel feels that the employee is in no condition to operate a vehicle, then the employee should be transported home. * * *

In the event of positive test results, the MRO will contact the Director of Personnel who will then review other records of the employee and contact the Knox County Law Director to work out proper disciplinary procedures, * * *.

(J.A. 46).

The Policy recognizes that information regarding an individual's drug testing results is confidential and "will be released by the MRO and the Director of Personnel only upon the written consent of the individual, except the results may be released and relied upon by the Knox County Board of Education in any administrative or court action by the employee involving the drug test, or any discipline resulting from a violation of this policy, including employment and court proceedings." (J.A. 1016–17). The Policy further provides that the substance screens will be maintained by the MRO in a secure fashion and disclosed to the Director of Personnel only to the extent necessary to address any work-related safety risks occasioned by either the drug or alcohol use. All personnel records and information regarding referral, evaluation, substance screen results, and treatment are to be maintained in a confidential manner and no entries concerning such will be placed in the employee's personnel file. In effect, two separate files will be maintained: one with the MRO indicating the results of the substance abuse tests and another maintained as part of the employee's personnel record.

Since the Board instituted its initial drug testing in December of 1989, four individuals have tested positive for drug/alcohol use: two teachers, one teacher applicant, and one employee in a non-safety-sensitive position. Three of those individuals were subject to

istered by commissioned law enforcement officers in the School Security Department.

drug testing on the basis of reasonable suspicion, and the other was subject to suspicionless pre-employment drug testing.

## IV. DISTRICT COURT OPINION

### A. Suspicionless Testing

The District Court applied the well-established balancing test to determine if the suspicionless drug testing program was lawful:

> [W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

(J.A. 52) (quoting *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)).

Conducting the balancing test, the District Court found that the state's asserted interest in insuring student safety was "diminished appreciably" by the lack of "evidence that the problem of drug/alcohol abuse by the persons tested" or any evidence of "a teacher or other employee responsible for children has allowed any harm or even a threat of harm to the children by being on the job in an impaired condition." (J.A. 57). The District Court also found that even if a teacher was impaired on the job, he or she would not pose the same risk of "disastrous" harm that courts have previously deemed sufficient to justify subjecting individuals to suspicionless drug testing. (J.A. 57) (referring to *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (railroad engineers) and *Rushton v. Nebraska Public Power District,* 844 F.2d 562 (8th Cir.1988) (nuclear power plant workers)).

Turning to the issue of individual privacy, the District Court found the testing procedures were "fairly intrusive," and infringed upon the legitimate expectations of privacy held by teachers and other professionals subject to the testing. (J.A. 58–59). The District Court rejected the argument that teachers had a "diminished expectation of privacy"

because the provision of public education was heavily regulated by the state, reasoning that public education is not "an industry heavily regulated in terms of safety." (J.A. 58–59).

Balancing the intrusion on privacy that resulted from suspicionless testing against the state's interest in such testing, the District Court concluded that the balance tilted heavily in favor of individual privacy interests. Thus, the District Court held that the suspicionless testing program violated the Fourth Amendment.

### B. Reasonable Suspicion Testing

The District Court ruled that the reasonable suspicion drug testing program was constitutional but that the reasonable suspicion alcohol testing program was constitutionally flawed.

#### 1. Drug Testing

The District Court found that the Policy's requirements of reasonable cause sufficiently limited the discretion of officials administering the rule and comported with the reasonableness requirement of the Fourth Amendment. This led the District Court to conclude that "the Policy's reasonable suspicion testing procedures adequately protect the government's interest in removing drug impaired employees from their jobs without invading their reasonable expectations of privacy." (J.A. 62).

#### 2. Alcohol Testing

The District Court found that the standards in the alcohol testing procedure were inadequate to protect the privacy interests of tested employees. The lack of standards, in combination with the fact that the level for a positive test was extremely low (at just one-fifth of the level required to test positive for drunk driving under Tennessee law), raised the possibility that an individual might test positive simply as a result of legal, off-duty consumption of alcohol. Finally, the District Court was concerned that under the Policy a law enforcement officer administers the test, despite the fact that Defendant now has its own equipment.

## V. STANDARD OF REVIEW

The ultimate question presented in this case is the reasonableness of a Fourth Amendment search, which is a question of law that we review de novo. *United States v. Jones,* 133 F.3d 358, 360 (5th Cir.1998) ("The ultimate determination whether the search or seizure was reasonable under the Fourth Amendment is reviewed de novo."); *United States v. Cantley,* 130 F.3d 1371, 1375 (10th Cir.1997) ("The reasonableness of a search and seizure under the Fourth Amendment is a question of law we review de novo."). The application of res judicata and collateral estoppel are also questions of law that we review de novo. *United States v. Real Property Known and Numbered as 415 East Mitchell Avenue,* 149 F.3d 472, 476 (6th Cir. 1998) ("We review de novo the applicability of collateral estoppel."); *Heyliger v. State University and Community College System of Tennessee,* 126 F.3d 849, 851 (6th Cir.1997) (Court of Appeals reviews de novo a district court's decision regarding collateral estoppel or res judicata).

## VI. ANALYSIS

The Fourth Amendment safeguards the privacy of individuals against arbitrary and unwarranted governmental intrusions by providing that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated".[9] However, "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402 (cites omitted). The reasonableness of a search "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (*citing New Jersey v. T.L.O.,* 469 U.S. 325, 337–342, 105 S.Ct. 733, 740–743, 83 L.Ed.2d 720 (1985)).

It is now well-settled that drug testing which utilizes urinalysis is a "search" that falls within the ambit of the Fourth Amendment. *See, e.g., Skinner,* 489 U.S. at 617, 109 S.Ct. 1402 (the collection and testing of urine intrudes upon expectations of privacy in such a way "that these intrusions must be deemed searches under the Fourth Amendment."). The Supreme Court jurisprudence in the area of drug testing is primarily reflected in four relatively recent decisions. Because an understanding of these cases is necessary to a meaningful analysis of the constitutionality of any drug testing regime, we briefly review those decisions.

In *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the Court considered the government's interest in testing railroad employees for drugs and alcohol after a serious accident without a showing of individualized suspicion that drugs were involved. The Court began its analysis by noting that the "problem of alcohol use on American railroads is as old as the industry itself," and that alcohol was the probable cause or a contributing factor in at least 21 significant accidents occurring between 1972 and 1983, resulting in 25 fatalities, 61 non-fatal injuries, and property damages estimated at over $19 million. It was against this backdrop that the Court evaluated the Federal Railroad Administration's regulations which mandated post-accident toxicological testing for all employees involved in the accident, and led the Court to determine that the government's interest in such testing was compelling because the "[e]mployees subject to the tests discharge duties fraught with risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 489 U.S. at 628, 109 S.Ct. 1402. The Court also noted that:

> By ensuring that employees in safety-sensitive positions know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct, cf. *Griffin v. Wisconsin,* 483 U.S. at 876, 107 S.Ct. at 3170,

**9.** The Fourth Amendment, although initially applicable only to the federal government, is now applicable to states as well by virtue of selective incorporation through the Fourteenth Amendment. *See, e.g., Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

concomitantly increasing the likelihood that employees will forgo using drugs or alcohol while subject to being called for duty.

*Skinner,* 489 U.S. at 630, 109 S.Ct. at 1420. The avoidance of such calamities outweighed the employees privacy interests, which were "diminished by reasons of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner,* 489 U.S. at 627, 109 S.Ct. 1402. Testing without a showing of a particularized suspicion was essential to the realization of a deterrent effect—i.e., the employee's inability to avoid detection simply by staying drug-free at a prescribed test significantly enhanced the deterrent effect.

In *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), which was decided the same day as *Skinner,* the Court upheld the United States Customs Service's drug testing of employees seeking promotion or transfer to positions involved in the interdiction of illegal drugs, which required them to carry firearms. The Service's drug testing regime was not prompted by a pronounced drug problem, but by its stature as the "Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population." *Von Raab,* 489 U.S. at 668, 109 S.Ct. 1384. The Court stated that it was "readily apparent" that the Government has a compelling interest in ensuring that the Service maintained unimpeachable integrity and judgment, and cautioned against the possibility of grievous consequences associated with having drug-using agents:

> This national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics. A drug user's indifference to the Service's basic mission or, even worse, his active complicity with the malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals. The public interest demands effective measures to bar drug users from positions directly involving the interdiction of illegal drugs.

*Von Raab,* 489 U.S. at 670, 109 S.Ct. 1384. The Court further noted that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Von Raab,* 489 U.S. at 671, 109 S.Ct. 1384.

Some six years later, in *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court reaffirmed the basic principals outlined by *Skinner* and *Von Raab.* In *Vernonia,* a school district implemented a random drug testing of students who participated in school athletic programs. The policy was prompted by a rampant increase in drug use, exacerbated by student athletes who were leaders of the drug culture. This caused significant concern because drug use increases the likelihood of sports related injury. The school district responded by offering presentations and classes to prevent drug use, but to no avail. Finally, with disciplinary problems at epidemic proportions and with a large segment of the student body (especially those involved in athletics) in a state of rebellion, the school administration, at its wits end, enacted a drug testing program for student athletes. The Court upheld the drug testing, noting that "students within the school environment have a lesser expectation of privacy than members of the population generally[,]" *Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386 (citing *New Jersey v. TLO,* 469 U.S. 325, 348, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)), and that school locker rooms are "not notable for the privacy they afford." *Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386. Additionally, student athletes' expectation of privacy is reduced by their voluntary decision to "go out for the team," thus subjecting themselves to a higher degree of regulation and physical scrutiny than other students.

The Supreme Court most recently addressed the issue of drug testing in *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137

L.Ed.2d 513 (1997).[10] In *Chandler*, candidates for high office in Georgia brought suit challenging the constitutionality of a statute which required candidates to submit to and pass a drug test within 30 days prior to qualifying for a nomination to qualify for certain state offices. Balancing the candidates' privacy expectations against the State's interest in drug testing them, the Court held the statute unconstitutional. Specifically, the Court held that the suspicionless testing did not meet the Fourth Amendment's "special needs" exception to overcome the need for a individualized suspicion of wrongdoing. The Court's decision rested in large part upon the lack of a demonstrated drug problem among state officeholders, which, while not necessary in all cases, would have shored up the assertion of a special need for a suspicionless general research program. *Chandler*, at ——, 117 S.Ct. at 1303. Ultimately, this led the Court to conclude that the Fourth Amendment shielded against drug tests such as Georgia's candidate drug test, which diminished "personal privacy for a symbol's sake." *Chandler*, at ——, 117 S.Ct. at 1305.

### A. Suspicionless Testing

■ As a general rule, in order to be reasonable, a search must be undertaken pursuant to a warrant issued upon a showing of probable cause. *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402 ("Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause."). That is, a valid search must ordinarily be based on an "individualized suspicion of wrongdoing." *Chandler*, at ——, 117 S.Ct. at 1301.

However, in *Chandler* the Court clarified how suspicionless testing—presumably inherently suspect because by definition it is not accompanied by individualized suspicion—can comport with the Fourth Amendment:

> But particularized exceptions to the main rule are sometimes warranted based on "special needs, beyond the normal need for

law enforcement." *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (internal quotation marks omitted). When such "special needs"—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. See *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91; see also *id.* at 668, 109 S.Ct. at 1392. As *Skinner* stated: "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." 489 U.S. at 624, 109 S.Ct. at 1417.

*Chandler*, at ——, 117 S.Ct. at 1301. Thus, where a Fourth Amendment intrusion serves special needs, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 109 S.Ct. at 1390. Quite simply, then, in evaluating the constitutionality of the Board's drug testing Policy here, we must balance the government's (or public's) interest in testing against the individual's privacy interest.

#### 1. Public Interest in Testing

■ With regard to the government's interest in testing, the Supreme Court has traditionally focused its analysis on two central factors: (1) whether the group of people targeted for testing exhibits a pronounced drug problem; and, if not, whether the group occupies a unique position such that the existence of a pronounced drug problem is unnecessary to justify suspicionless testing; and (2) the magnitude of the harm that could result from the use of illicit drugs on the job.

The existence of a pronounced drug problem within the group of employees targeted

---

**10.** The District Court did not have the benefit of *Chandler,* which post-dated the District Court's opinion in the instant case by about six weeks.

for testing typically tips the equities in favor of upholding suspicionless testing. For example, in *Skinner* the Court traced the history of drug and alcohol abuse among train operators and in *Vernonia* emphasized the rampant increase in drug use among students participating in school athletic programs—in both cases the existence of a pronounced drug problem contributed to the Court's upholding of the drug testing regimes. Likewise, in *Chandler*, the Court stated that the lack of a demonstrated drug problem among state officeholders in Georgia mitigated against allowing an unintrusive drug testing requirement. Thus, as would be expected when using a balancing test, in cases in which a pronounced drug problem exists within the target group, a drug testing regime has a higher likelihood of being deemed constitutional because the more pernicious the drug problem is, the greater the public's interest is in abridging it.

█ In this case, there is little, if any, evidence of a pronounced drug or alcohol abuse problem among Knox County's teachers or other professional employees. Specifically, there is no empirical or historical evidence of an ongoing abuse problem (as in *Skinner*) or evidence of a newly blossoming epidemic of abuse (as in *Vernonia*). In fact, since the Policy was implemented in 1989, only one prospective hire has failed the suspicionless drug test.[11]

However, the existence of a pronounced drug problem is not a *sine qua non* for a constitutional suspicionless drug testing program. The Board argues that there is no indication that teachers are unaffected by the drug use affliction that affects our country as a whole, and that proof of a pronounced drug problem is unnecessary. The Board's argument relies heavily on *Von Raab*, in which the Court upheld a suspicionless drug testing program in the absence of a drug problem among Customs Service agents. In *Chandler*, the Court explained that *Von Raab* was based on a unique set of circumstances:

> Hardly a decision opening broad vistas for suspicionless searches, *Von Raab* must be read in its unique context. As the Customs Service reported in announcing the testing program, "[Customs employees], more than any other Federal workers, are routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use." *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 173 (C.A.5 1987) (internal quotation marks omitted), aff'd. in part, vacated in part, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). We stressed that "[d]rug interdiction ha[d] become the agency's primary enforcement mission," *id.* at 660, 109 S.Ct. at 1387–88, and that the employees in question would have "access to vast sources of valuable contraband," *id.* at 669, 109 S.Ct. at 1392–93. Furthermore, Customs officers "ha[d] been the targets of bribery by drug smugglers on numerous occasions," and several had succumbed to the temptation. *Ibid.*

> Respondents overlook a telling difference between *Von Raab* and Georgia's candidate drug-testing program. In *Von Raab* it was "not feasible to subject employees [required to carry firearms or concerned with interdiction of controlled substances] and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Id.* at 674, 109 S.Ct. at 1395. Candidates for public office, in contrast, are subject to relentless scrutiny—by their peers, the public, and the press. Their day-to-day conduct attracts attention notably beyond the norm in ordinary work environments.

*Chandler*, at ——, 117 S.Ct. at 1304.

Just as the Customs agents in *Von Raab* must be considered in their own unique context, so too must the nature of the work and positions of school teachers and administrators be viewed as unique. We can imagine few governmental interests more important to a community than that of insuring the safety and security of its children while they are entrusted to the care of teachers and

---

11. Of course, this figure may be misleading in that it does not account for the deterrent effect the existence of the program has had on prospective employees, who know in advance that they are going to be tested.

administrators. Concomitant with this governmental interest is the community's interest in reasonably insuring that those who are entrusted with the care of our children will not be inclined to influence children—either directly or by example—in the direction of illegal and dangerous activities which undermine values which parents attempt to instill in children in the home. Indeed, teachers occupy a singularly critical and unique role in our society in that for a great portion of a child's life, they occupy a position of immense direct influence on a child, with the potential for both good and bad. Teachers and administrators are not simply role models for children (although we would certainly hope they would be that). Through their own conduct and daily direct interaction with children, they influence and mold the perceptions, and thoughts and values of children. Teachers and administrators are not some distant societal role models, as in the case of the Georgia political candidates in *Chandler*; rather, on a daily basis, there is a direct nexus between the jobs of teachers and administrators and the influence they exert upon the children who are in their charge. Indeed, directly influencing children is their job.

The State of Tennessee has recognized and codified this role and obligation in TCA § 49–6–4203(b), which states that teachers shall serve in an *in loco parentis* capacity and are charged with the responsibility "to secure order and to protect students from harm while in their custody." Thus, by operation of law, during school hours and at school related events, teachers stand in the place of students' natural parents and are responsible for their safekeeping. The existence of this duty is itself "unique" to school teachers and administrators, and, we believe, is, by itself, great enough to overcome the presumption against suspicionless testing.

While serving in their *in loco parentis* capacity, teachers are on the "frontline" of school security, including drug interdiction.

(J.A. 937; Griffin Dep., 162). While teachers may not be exposed to a vast network of organized crime in this capacity, they are faced with pervasive drug use in our schools,[12] and are perhaps in the best position to determine if a child is either in danger or involved with drugs. Indeed, a compilation of incidents in the Knox County school system reveals that there were 77 documented occurrences of substance abuse in 1996. That figure does not include, of course, all of the incidents that went undetected. In most cases, teachers and other school officials are responsible for reporting the prohibited activity. (J.A. 943; Griffin Dep., 168) ("If it weren't for the teachers we wouldn't have these reports in front of us."). Thus, unlike candidates for public office who may indirectly affect the lives of children as role models and policymakers, teachers directly influence and supervise children daily.

In further distinguishing *Chandler*, we also observe that teachers are not subject to the same day-to-day scrutiny as are candidates for public office, which would, at least to some extent, mitigate the need for suspicionless testing. Like Custom's agents, teachers do not work in an ordinary work environment in which they are constantly scrutinized by their peers and others; rather, they spend most of their days (about 6 hours) in the solitude of their classrooms surrounded only by students, some of whom are very young, who may or may not be able to detect drug use among teachers. Even if a student did detect drug use by a teacher, that student would likely be wary of reporting such conduct for fear of being disbelieved, ridiculed, or retaliated against.

In short, although the record evidence does not reflect that the Knox County District school teachers and other such officials have a track record of a pronounced drug problem, the suspicionless testing regime is justified by the unique role they play in the lives of school children and the *in loco parentis* obligations imposed upon them.

---

**12.** The prevalence of drug use among our nation's youth is beyond dispute. According to the DEA, in 1996 18% of eighth graders used marijuana (up from 6% in 1991), and 34% of tenth graders used marijuana (up from 15% in 1992). In that same year, one in four tenth-graders and twelfth-graders reported using drugs in the previous 30 days; and fifteen percent of eighth-graders reported using drugs in the previous 30 days. According to the FBI, there were over 60,000 juvenile arrests for possession in 1994.

The second factor we must consider in the balancing test analysis focuses on the magnitude of harm that could result from the use of illicit drugs in any given set of circumstances. In this case, the public interest proffered by the Board is that teachers, principals, and other such school personnel hold safety-sensitive positions and that the school district has a legitimate and strong interest in safeguarding the health and welfare of its students by ensuring that people in safety-sensitive positions are not under the influence of drugs or alcohol at school. The validity of this argument hinges in large part upon whether or not teachers, principals, and the other school officials covered by the testing actually occupy "safety-sensitive" positions.

 As a threshold matter, the Court rejects the Board's assertion that the issue of whether teachers are safety-sensitive employees has already been decided in its favor in prior litigation between the parties, and that res judicata and collateral estoppel bar the re-litigation of that issue. The doctrine of res judicata or claim preclusion states that a final and valid judgment on the merits of a claim precludes subsequent action on that claim. The doctrine precludes re-litigation on claims actually litigated as well as claims that could have been litigated. *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 797 n. 4, 116 S.Ct. 1761, 1765 n. 4, 135 L.Ed.2d 76 (1996)( "The doctrine of res judicata rests at bottom upon the ground that the party to be affected, or some other with whom he is in privity, has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction."); *Heyliger v. State University and Community College System of Tennessee*, 126 F.3d 849, 852 (6th Cir.1997). Under the doctrine of collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

 In December of 1989, the Defendant Board of Education adopted a "Drug–Free Workplace Policy," which was revised several times over the course of the next two and a half years. In 1991, Plaintiff in the instant case, KCEA, filed suit challenging the policy on Fourth Amendment grounds ("KCEA I"). In that case, the district court noted that the policy did not describe the methods or procedures to be followed in obtaining or testing urine samples, nor did it assure the employee applicants that their privacy interests in the results would be protected. This led the court to conclude: "Because the privacy interests of the professional employee applicants in this case are not protected at all by the policy as it is written, the court finds that *for this reason alone* the policy must fail constitutional examination." (J.A. 282) (emphasis added).

However, the court did not end its inquiry at that point. The court addressed the second part of the balancing test to examine whether the governmental interests were strong enough to test all professional employees, irrespective of the nexus their position had to the safety of the children. The court then found that of the professional employee positions subject to pre-employment drug screening, principals (and assistant principals), teachers (and traveling teachers), teacher aids, and school secretaries occupied safety sensitive positions because "[a]ny lapse in attention or judgment on the part of these employees could result in an immediate threat to a child's safety." (J.A. 284–85). This led the court to conclude:

Thus, *even if the policy adequately protected the privacy interests of the professional employees, and the court finds that it does not,* the only professional employees which the court considers subject to pre-employment testing are principals, assistant principals, teachers, traveling teachers, teacher aids, and school secretaries.

(J.A. 287) (emphasis added).

 Despite the fact that the district court continued its inquiry to include an analysis of which employees qualified as safety sensitive, it is obvious that this determination was not necessary to the ruling finding the drug testing scheme unconstitutional. In order to find that either doctrine bars the re-litigation of an issue, the issue must have

been "necessary to support the judgment entered in the prior proceeding." *NLRB v. Master Slack,* 773 F.2d 77, 81 (6th Cir.1985). *See also, Marlene Industries Corp. v. NLRB,* 712 F.2d 1011, 1015–16 (6th Cir.1983) ("The determination of an issue in an earlier proceeding must be essential to the judgment; it cannot be dicta.") (citing *Anthan v. Professional Air Traffic Controllers Org.,* 672 F.2d 706, 710 (8th Cir.1982)). The district court clearly ruled that because the privacy interests of the employee were not protected at all by the drug testing scheme as it existed at that time that the testing was unconstitutional. By the court's own statement, that reason alone was sufficient to render the scheme unconstitutional, and any further explanation of its unconstitutionality was gratuitous and constitutes dicta. The court reiterated the alternative nature of the ruling when it stated that "even if the policy adequately protected the privacy interests of professional employees, and the court finds that it does not, the only professional employees which the court considers subject to pre-employment testing are principals, assistant principals, teachers, traveling teachers, teacher aids, and school secretaries." (J.A. 287).

■ Clearly, then, the court's ruling on which employees occupied safety-sensitive positions was not essential to the disposition

of the case, and, therefore, cannot preclude Plaintiff from litigating that issue in this case.[13] Thus, the Court must proceed in making its own determination of whether teachers and other school administrators occupy safety-sensitive positions.

■ Under *Skinner,* the test for whether employees hold safety sensitive positions is whether the employees "discharge duties fraught with risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 489 U.S. at 628, 109 S.Ct. 1402. In *Skinner,* which involved drug testing for railroad engineers, the Court stated that a locomotive "becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs," and that drug use among these employees "can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Skinner,* 489 U.S. at 628, 109 S.Ct. 1402. Courts have found similar risks inherent in several other positions, including: nuclear power plant workers [14], seamen operating oil tankers [15], a meter repairman for a gas company [16], a firefighter and emergency medical technician [17], a process technician at a petro-refining facility [18], police officers [19], a bus driver [20], and pipeline operators [21].

13. Defendant also spends a great deal of its brief arguing that the District Court erred by not taking judicial notice of the safety-sensitive ruling from the prior litigation. This contention is plainly without merit. The statement in KCEA I that teachers hold safety-sensitive positions is not the type of undisputable fact of which the court may take judicial notice under Rule 201 of the Federal Rules of Evidence.

14. *Rushton v. Nebraska Public Power District,* 844 F.2d 562, 566 (8th Cir.1988).

15. *Exxon v. Exxon Seamen's Union,* 73 F.3d 1287, 1294 (3rd Cir.1996)("A clearly defined and cautiously administered program of drug testing ... is the natural corollary to ... a strong public policy that precludes allowing intoxicated or drug-impaired seamen to remain in safety-sensitive positions aboard oil tankers.").

16. *Mountaineer Gas Company v. Oil, Chemical & Atomic Workers International Union,* 76 F.3d 606, 609 (4th Cir.1996) (court implicitly accepted district court and arbitrator's finding that gas meter repairman occupied a safety sensitive position).

17. *Saavedra v. Albuquerque,* 73 F.3d 1525, 1532 (10th Cir.1996).

18. *Gulf Coast Industrial Workers Union v. Exxon,* 991 F.2d 244, 250 (5th Cir.1993). As a process technician, Woods was freely transferable into assignments involving the supply of electricity, steam, water, and nitrogen to other parts of the plant. These volatile gases and liquids are produced and handled at extremely high temperatures and pressures. The court held "that it offends public policy for Woods, an employee who occupies a safety-sensitive position, to retain his job upon testing positive for cocaine while on the job and after having breached his company's drug abuse policy on two occasions[.]"

19. *Ford v. Dowd,* 931 F.2d 1286, 1290 (8th Cir. 1991).

20. *Tanks v. Greater Cleveland Regional Transit Authority,* 930 F.2d 475, 480 (6th Cir.1991).

21. *International Brotherhood of Electrical Workers v. Skinner,* 913 F.2d 1454, 1463 (9th Cir. 1990). That decision also noted several other

Thus, in order to show that school teachers and administrators also occupy safety-sensitive positions, the Board must demonstrate a "clear, direct nexus ... between the nature of the employee's duty and the nature of the feared violation." *Georgia Association of Educators v. Harris*, 749 F.Supp. 1110, 1115 (N.D.Ga.1990) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 490 (D.C.Cir.1989), *cert. den. sub. nom., Bell v. Thornburgh*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990)).

Although the position of school teacher may not fit neatly into the prototypical "safety-sensitive" position,[22] we do not read the definition of "safety-sensitive" so narrowly as to preclude application to a group of professionals to whom we entrust young children for a prolonged period of time on a daily basis. Simple common sense and experience with life tells us "that even a momentary lapse of attention can have disastrous consequences," *Skinner*, 489 U.S. at 628, 109 S.Ct. 1402, particularly if that inattention or lapse were to come at an inopportune moment. (See testimony of Grant at J.A. 958–59; Staley at J.A. 996–98). For example, young children could cause harm to themselves or others while playing at recess, eating lunch in the cafeteria (if for example, they began choking), or simply while horsing around with each other. Children, especially younger children, are active, unpredictable, and in need of constant attention and supervision. Even momentary inattention or delay in dealing with a potentially dangerous or emergency situation could have grievous consequences.

This is equally true of teaching at the high school level. Not only must teachers observe and report drug use, but they are also charged, by law, with reporting assaults as well. TCA § 49–6–4301(a) provides that "[e]very teacher observing or otherwise having knowledge of an assault and battery or vandalism endangering life, health or safety committed by a student on school property shall report such action immediately to the principal of the school." Fifty such incidents occurred in Knox County schools in the 1995–96 school year, and 77 in the 1994–95 school year.[23]

---

22. In fact, we are aware of three decisions which have ruled either implicitly or explicitly that teachers do not occupy safety-sensitive positions. *See, Patchogue–Medford Congress of Teachers v. Board of Education of Patchogue–Medford Union Free School Dist.*, 119 A.D.2d 35, 505 N.Y.S.2d 888, 891 (1986) (proposition that "illegal drug usage can have an adverse impact upon a teacher's ability to safeguard and supervise pupils" did not render teachers safety-sensitive employees under applicable law); *Georgia Ass'n of Educators v. Harris*, 749 F.Supp. 1110 (N.D.Ga.1990) (enjoining pre-employment drug testing of all applicants for state employment including teacher applicants); *Bangert v. Hodel*, 705 F.Supp. 643, 649 (D.D.C.1989) (enjoining random drug testing of Department of Interior employees, including teachers in Bureau of Indian Affairs).

 *But see, Aubrey v. School Board of Lafayette Parish*, 92 F.3d 316 (5th Cir.1996) (appeals court reversed and remanded case in which district court had granted summary judgment because the record did not contain enough evidence to determine whether a school janitor, who's job description included handling chemical solvents, operating a lawn mower, working with electricity, and lighting gas pilots, occupied a safety sensitive position).

23. Indeed, we do not have to search beyond recent local and national media headlines to understand that schools are, unfortunately, too often turned into places in which children are

---

cases in which courts have upheld random drug tests for employees with safety-sensitive, security-sensitive, or public-integrity-sensitive jobs. *See, e.g., Bluestein v. Skinner*, 908 F.2d 451 (9th Cir. 1990) (airline industry personnel); *Taylor v. O'Grady*, 888 F.2d 1189, 1199 (7th Cir.1989) (correctional officers in regular contact with inmates); *American Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884, 893 (D.C.Cir.1989) (various transportation workers), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990); *National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 615 (D.C.Cir.1989) (Army civilian guards), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); *Thomson v. Marsh*, 884 F.2d 113, 115 (4th Cir.1989) (per curiam) (civilian workers in Army chemical weapons plant); *Harmon v. Thornburgh*, 878 F.2d 484, 496 (D.C.Cir.1989) (Justice Department employees with clearance for top-secret information), *cert. denied sub nom. Bell v. Thornburgh*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990); *Guiney v. Roache*, 873 F.2d 1557, 1558 (1st Cir.) (per curiam) (police officers carrying firearms or engaged in drug interdiction efforts), *cert. denied*, 493 U.S. 963, 110 S.Ct. 404, 107 L.Ed.2d 370 (1989); *Rushton v. Nebraska Pub. Power Dist.*, 844 F.2d 562, 567 (8th Cir. 1988) (nuclear power plant engineers); *Transport Workers' Union v. Southeastern Pennsylvania Transp. Authority*, 884 F.2d 709, 713 (3d Cir. 1988) (mass transit workers).

The Court believes that a local school district has a strong and abiding interest in requiring that teachers and other school officials be drug-free so that they can satisfy their statutory obligation to insure the safety and welfare of the children. The fact that the Board has not been able to cite any one specific example in which a teacher or other employee responsible for children has allowed any harm to the children by being in an impaired condition while on the job is certainly not dispositive of the question of whether teachers and administrators hold "safety-sensitive" positions. We do not believe that the Board must wait passively for a disaster to occur before taking preemptive action to minimize the risks of such an occurrence. Indeed, we have no doubt that if a tragedy were to befall one or more of the school children of Knox County that in some manner implicated a teacher or administrator being under the influence of an illegal substance, the members of that community would rightly question why the Board had not taken all efforts possible in advance to prevent such an occurrence.

Finally, we would be remiss if we did not point out that the safety sensitive nature of a teacher's or administrator's job is not limited to the necessity to act at the immediate time of a dangerous event. Rather, school personnel perform an essential monitoring role in preventing incidents from occurring in the

first place. Teachers and administrators are in a unique position to observe children and learn if they are involved in activities which can lead to harm or injury to themselves or others. Clearly, if school personnel are themselves under the influence of, or involved in, drugs, their ability to perform this critical function is not only reduced, but they themselves are open to being compromised and undermined. Clearly, a school board has a very strong interest in preventing this as part of its responsibility to insure the safety and security of school children.

### 2. Privacy Interest of Employees

 Having ruled that the public interest in suspicionless testing is very strong, an analysis of the employee's privacy rights is necessary to determine which of the competing values should prevail in this case.[24] As will become evident in the course of this analysis, because teachers' legitimate expectation of privacy is diminished by their participation in a heavily regulated industry and by the nature of their job, the public interest in suspicionless testing outweighs that private interest. Again, we read the Supreme Court precedents assessing the privacy interests of employees as focusing on two central factors: (1) the intrusiveness of the drug testing scheme; and (2) the degree to which the industry in question is regulated.

---

subjected to grave and even life-threatening dangers wherein the split-second vigilance of teachers and administrators, and the need for clearheaded thinking, is absolutely critical to the safety of the school children. Whether we consider the recent tragic schoolyard shootings in Jonesboro, Arkansas and Springfield, Oregon, or simply the myriad media reports of children being found in schools with dangerous weapons, we intuitively understand the importance of insuring that those who are responsible for the safety and security of children while they are at school must at all times be prepared to exercise clear, unimpaired judgment and leadership.

**24.** Although not raised by the parties in their briefs, the Court questioned at oral argument the Union's standing to bring this action in order to protect the employees' privacy rights. Generally, such Fourth Amendment issues require a showing of particularized individual injury by the person asserting the violation. See, e.g., Rakas v. Illinois, 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) ("Fourth Amendment rights

are personal and may not be asserted vicariously."). At oral argument, counsel for the Board informed the Court that he did not raise the issue because it had been raised in KCEA I, but dismissed by Judge Jordan.

In any event, a union does have representational standing to challenge the constitutionality of an alcohol and drug testing policy on behalf of its members. See, e.g., Von Raab, 489 U.S. at 663, 109 S.Ct. 1384 (the plaintiffs, a union of federal employees and a union official, commenced suit on behalf of Customs Service employees challenging the constitutionality of drug testing under the Fourth Amendment); Skinner, 489 U.S. at 612, 109 S.Ct. 1402 (the plaintiffs, the Railway Labor Executives' Association and its various member labor organizations, brought suit against the Secretary of Transportation challenging drug testing regulations for railway employees under the Fourth Amendment). Therefore, it is clear that the Union has standing because the Policy applies to employees who are already members of the Union, but who transfer to safety-sensitive positions.

We begin by noting that drug testing does implicate the privacy interests of employees on several levels. As the Supreme Court noted in *Skinner*, urination is an intensely private and personal act. *Skinner*, 489 U.S. at 617, 109 S.Ct. 1402 ("There are few activities in our society more personal or private than the passing of urine.").[25] The "physical intrusion infringes an expectation of privacy that society is prepared to recognize as reasonable ... [and][t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests." *Skinner*, 489 U.S. at 616, 109 S.Ct. 1402. In fact, the testing is deemed a search precisely because it implicates concerns about bodily integrity. *Skinner*, 489 U.S. at 617, 109 S.Ct. 1402. Furthermore, "the limitation on an individual's freedom of movement that is necessary to obtain blood, urine, or breath samples" also amounts to a Fourth Amendment violation, if unreasonable. *Skinner*, 489 U.S. at 618, 109 S.Ct. 1402.

Although the drug testing regime presented in this case is, in certain respects, somewhat more intrusive than other regimes, judged as a whole it is fairly circumscribed and unintrusive. It does not include a random testing component, and only tests those people who are candidates for, and attempting to transfer to, a select group of positions. There is no ongoing testing once an applicant has received the job and passed the initial test. All specimens identified as positive are re-tested and confirmed using an advanced testing procedure. The testing procedures include extensive involvement from a Medical Review Officer (MRO), who reviews every positive result to determine if there is an alternative medical explanation for the result and conducts an interview with the individual testing positive and reviews his or her medical records to determine if the positive result was caused by a legally prescribed medication.

Further, the Policy recognizes that information regarding an individual's drug testing results is confidential and provides extensive safeguards concerning the release and dissemination of the testing information, specifically that the results "will be released by the MRO and the Director of Personnel only upon the written consent of the individual, except the results may be released and relied upon by the Knox County Board of Education in any administrative or court action by the employee involving the drug test, or any discipline resulting from a violation of this policy, including employment and court proceedings." (J.A. 1016–17). The Policy further provides that the substance screens will be maintained by the MRO in a secure fashion and disclosed to the Director of Personnel only to the extent necessary to address any work-related safety risks occasioned by either the drug or alcohol use. All personnel records and information regarding referral, evaluation, substance screen results, and treatment are to be maintained in a confidential manner and no entries concerning such will be placed in the employee's personnel file. In effect, two separate files will be maintained: one with the MRO indicating the results of the substance abuse tests and another maintained as the employee's personnel record.

With respect to the procedures for insuring the individual's privacy during the actual taking of the urine sample itself, the Policy provides that the urine sample may be given by the individual in private without any monitoring, except in those cases in which there is reason to believe that the individual will adulterate the sample. Although this may be more invasive than some policies, it is not unreasonable. For all of these reasons, we find that the drug testing requirement here is only minimally intrusive and is only so broad as to achieve the legitimate objectives of the Policy.

Plaintiff contends that the drug testing procedures themselves violate the Fourth Amendment by testing for eighteen different drugs, eleven of which are not drugs included in the Department of Transportation proce-

---

25. Although we are prepared to recognize the privacy interest identified here, we believe this characterization of the level of the privacy expectation may be somewhat overdrawn. Anybody who has stood in line in men's room urinals at sports stadiums, public arenas, theaters or public bars understands that the act of urination is not always an altogether private one.

dures and which can be found in common medicines.

The tests screen for the following drugs: marijuana, cocaine, phencyclidine, amphetamines, methamphetamine, phenobarbital, secobarbital, amobarbital, butalbital, pentobarbital, propoxyphene, methadone, morphine, codeine, monacetilmorphine, and benzodiazepines. (J.A. 1017). In this respect, the Policy departs from D.O.T. procedures, which allow testing for five (but effectively seven)[26] of these eighteen drugs. The five drugs tested for under the D.O.T. guidelines are classified as Schedule I, II, or III drugs under the Controlled Substances Act, whereas the remaining drugs for which Defendant screens include Schedule IV and V drugs, i.e., drugs that have an accepted medical use and a lower potential for abuse. The additional drugs for which Defendant screens can be found in medications such as Robitusson A–C and Robitusson DAC (used to treat chest colds); Axocet, Egsic–Plus, Fiorinal, Fioricet, and Sedapap (used to treat tension headaches); Arco–Lase Plus and Donnatal (used to relieve gastrointestinal disorders); Bellergal (used to treat menopausal disorders); Quadrinal (used to treat asthma and chronic bronchitis); and Valium and Dizac (used to treat stress).

The Department of Health and Human Services has approved testing protocols and positive threshold levels only for the five drugs specified in the D.O.T. procedures, and, consequently, uniform standards are not available for testing for the presence of other drugs, federal drug-testing certification of laboratories to conduct such tests is not available, and the federal medical review officer procedure (used by the Board) provides little guidance in reviewing the results of such drug tests. The DOT regulations, which Defendant's drug testing Policy is modeled after to some extent, have specifically rejected allowing employers to test for additional drugs using the DOT urine sample because "[t]esting for additional drugs increases the privacy intrusion of testing[,]"

and "may make court approval of DOT-required testing more difficult." 49 C.F.R. Part 40. The regulations specifically note the drawbacks of testing for drugs other than the five specifically approved of in *Skinner:*

DHHS-approved testing protocols and positive thresholds for drugs beyond the five for which testing is now required do not exist. DHHS certification of laboratories does not extend to testing of any of the additional drugs. Consequently, the uniform standards crucial to the accuracy and integrity of the testing process, which courts have relied upon in upholding Federally-required drug testing, are not now in place for the additional drugs. This absence of uniform standards could also make defense of the DOT regulations in court more difficult.

There are also unresolved practical problems that could result from DOT permitting employers to use the "DOT sample" to test for additional drugs. Many of the additional substances commentators expressed a desire to test for are widely available as prescription drugs (e.g., barbiturates). The Medical Review Officer's task in determining whether the drug use indicated by the test is legitimate (and hence not a verified positive) is likely to be significantly more difficult in dealing with legal prescription drugs. The use of DOT-mandated tests to discover the presence of a variety of legal prescription drugs, and therefore to permit employer inferences about otherwise confidential medical conditions, could not be prevented.

For these reasons, the Department believes that it is inadvisable at this time to grant employers the discretion to test the "DOT sample" for additional drugs.

49 C.F.R. Part 40.

As the DOT regulations recognize, testing for the additional drugs has some shortcomings, including increasing the privacy intrusion by revealing more in-depth information

---

**26.** This qualification is necessary because, although the D.O.T. only tests for five drugs (marijuana, cocaine, opiates, amphetamines, and phencyclidine), a urinalysis for opiates discloses the presence of both morphine and codeine, and a urinalysis for amphetamines discloses the presence of methamphetamines, and, thus, the D.O.T. procedures allow testing for seven of the drugs for which Knox County tests.

about the subject and the lack of uniform standards for testing for the additional drugs. Although the Court expresses concern over this portion of the test, and believes the testing for these drugs may be unnecessary, the shortcomings highlighted by the DOT regulations are insufficient to render the test unconstitutional. The Policy protects against the false positives by having the MRO conduct an interview with the individual testing positive and by enabling the MRO to review the individual's medical history and medical records to determine if the positive result was caused by legally prescribed medication. While this may make the drug testing process slightly more intrusive, because if individuals test positive for one of these additional drugs they may have to divulge additional personal medical history in order to vindicate themselves, that intrusiveness is minimized by the Policy's disclosure requirements. That is, because the Policy only requires that the employee reveal the information to the MRO, the additional privacy invasion is minimal.

With respect to the expectation of privacy of school personnel, we must first inquire into the degree with which the teaching and school administration is regulated by the state. The Board contends that the employees subjected to the drug testing participate in a heavily regulated profession and, accordingly, have a diminished expectation of privacy. In support of this contention, the Board cites a panoply of Tennessee regulations that apply to schools in general, and specifically to students, school boards, and teachers. The District Court ruled that teachers do not have a diminished expectation of privacy because those regulations do not, for the most part, apply to teachers regarding safety. (J.A. 58).[27] We find the District Court erred in its ruling that to be heavily regulated, the regulations in question had to relate exclusively to safety, as this view is simply not supported by the relevant authority.

Under the relevant Supreme Court precedents discussed above, the expectation of privacy associated with not submitting to a drug test may be diminished if the employee participates in a heavily regulated industry. *See, e.g., Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386 (students that volunteer for student athletics are analogous to employees in heavily regulated industries); *Skinner,* 489 U.S. at 620, 109 S.Ct. 1402 (railroad employees in a heavily regulated industry).

In *Skinner,* the Court explained in detail how the expectations of railroad operators are greatly diminished by their participation "in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner,* 489 U.S. at 627, 109 S.Ct. 1402. The Court continued on to state:

This relation between safety and employee fitness was recognized by Congress when it enacted the Hours of Service Act in 1907, *Baltimore & Ohio R. Co. v. ICC,* 221 U.S. at 619, 31 S.Ct. at 625, and also when it authorized the Secretary to "test ... railroad facilities, equipment, rolling stock, operations, or persons, as he deems necessary to carry out the provisions" of the Federal Railroad Safety Act of 1970. 45 U.S.C. § 437(a) (emphasis added). It has also been recognized by state governments, [Footnote omitted] and has long been reflected in industry practice, as evidenced by the industry's promulgation and enforcement of Rule G. Indeed, the FRA found, and the Court of Appeals acknowledged, see 839 F.2d at 585, that "most railroads require periodic physical examinations for train and engine employees and certain other employees." 49 Fed.Reg. 24278 (1984). [Cites omitted].

We do not suggest, of course, that the interest in bodily security enjoyed by those employed in a regulated industry must always be considered minimal. Here, however, the covered employees have long

---

**27.** The District Court's entire analysis on this issue was as follows:

 The defendant argues that education is heavily regulated in Tennessee by statute and regulation, and that the employees working in

that area therefore have a diminished expectation of privacy. I disagree. The statutes and regulations to which the defendant refers do not, for the most part, deal with safety.

(J.A. 58).

been a principal focus of regulatory concern.

*Skinner,* 489 U.S. at 627–28, 109 S.Ct. 1402.

In *Vernonia,* the Court analogized student athletes to the heavily regulated employees of the railroad industry, stating:

> There is an additional respect in which school athletes have a reduced expectation of privacy. By choosing to "go out for the team," they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. In Vernonia's public schools, they must submit to a preseason physical exam (James testified that his included the giving of a urine sample, App. 17), they must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average, and comply with any "rules of conduct, dress, training hours and related matters as may be established for each sport by the head coach and athletic director with the principal's approval." Record, Exh. 2, p. 30, P 8. Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy. See *Skinner,* 489 U.S. at 627, 109 S.Ct. at 1418–19; *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972).

*Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386.

Contrary to the District Court's ruling that the regulations at issue had to relate specifically to safety regarding students, the regulations in both *Skinner* and *Vernonia* indicated that the focus was much broader. In *Skinner,* the Court noted that facilities, equipment, operations, and employees in the industry were subject to regulation, although the health of the covered employees was the principal concern. In *Vernonia,* the Court analogized student athletes to participants in a heavily regulated industry in part because of safety regulations, but also because of regulations requiring them to maintain a minimum grade point average, and to comply with any "rules of conduct, dress, training hours and related matters" of each sport. *Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386.

These cases demonstrate that the entire focus of the regulations need not be on the employees themselves, or relate to safety *per se,* in order for the industry to be considered heavily regulated.

As the Board's brief makes clear, regulations concerning Tennessee public schools generally are legion. These regulations include those promulgated by the School Security Act of 1981 which recognized the position of schools "in loco parentis and the responsibility this places on principals and teachers within each school to secure order and to protect students from harm while in their custody." T.C.A. § 49–6–4203(b). Various state regulations apply to the implementation of drug abuse education, school safety and security, discipline, drug use among students, the search of students lockers for drugs and weapons (including a provision specifically providing that "information received from a teacher" may provide the basis for a search), and a requirement that local school boards formulate a code of acceptable behavior and discipline, as well as attendance, curriculum and report cards.

Perhaps most notably, the state legislature has imposed a requirement for teachers and principals to report student offenses, which states:

> Every teacher observing or otherwise having knowledge of an assault and battery or vandalism endangering life, health or safety committed by a student on school property shall report such action immediately to the principal of such school. Every principal having direct knowledge of an assault and battery or vandalism endangering life, health or safety committed by a student on school property or receiving a report of such action shall report such action immediately to the municipal or metropolitan police department or sheriff's department having jurisdiction.

T.C.A. § 49–6–4301(a). Thus, the state legislature has acknowledged the role of the teacher and principal as front-line observers in providing for a safe school environment, and, in fact, has imposed on them a duty to report matters that endanger life, health, or safety.

Furthermore, state law also regulates teachers and principals, setting forth their duties, responsibilities, certification, qualification and licensing requirements. T.C.A. § 49–5–101, et. seq. While state law provides for teacher tenure and imposes certain procedural safeguards in the event a teacher were to face dismissal or suspension, it also sets out reasons for which a teacher may be dismissed or suspended, including the "improper use of narcotics or intoxicants." T.C.A. § 49–5–501(3)(E).

Thus, the Court believes that when people enter the education profession they do so with the understanding that the profession is heavily regulated as to the conduct expected of people in that field, as well as the responsibilities that they undertake toward students and colleagues in the schools. It does not matter, as the District Court seemed to emphasize, that most of the regulations do not deal with safety *per se*, although, as noted, a number of the regulations are, in fact, related to safety. As *Vernonia* and *Skinner* make clear, our general focus is not whether teachers are heavily regulated, but if they participate in a heavily regulated profession or industry. In this case, the "industry"— public schools—is heavily regulated, and much of that regulation focuses on the conduct of teachers and principals. As noted above, certain portions of Tennessee law specifically require teachers and principals to report activity endangering "life, health, or safety," and other regulations relate to drug use in the schools. Given this level of regulation, the Court finds that teachers should not be surprised if their own use of drugs is subject to regulation and testing and, as such, their expectation of privacy, at least with respect to drugs and drug usage, might be diminished.

That a teacher's expectation of privacy as to drug use might be diminished is further underscored by the unique role teachers play in the lives of our nation's children. As we have noted, teachers are not just role models, but mentors, friends, and in some cases, parent-figures that stand in the place of absent parents. Teachers leave indelible impressions on the minds of their young students, because they are entrusted with the safe keeping and education of children during their most impressionable and formative years. Therefore, teachers must expect that with this extraordinary responsibility, they will be subject to scrutiny to which other civil servants or professionals might not be subjected, including drug testing.

For all of the reasons stated here, we believe that the privacy interest for the employees not to be tested is significantly diminished by the level of regulation of their jobs and by the nature of the work itself. The ultimate inquiry before the Court is whether the search at issue here—the one-time, suspicionless testing of people hired to serve in teaching and administrative positions—is reasonable. On balance, the public interest in attempting to ensure that school teachers perform their jobs unimpaired is evident, considering their unique *in loco parentis* obligations and their immense influence over students. These public interests clearly outweigh the privacy interests of the teacher not to be tested because the drug-testing regime adopted by Knox County is circumscribed, narrowly-tailored, and not overly intrusive, either in its monitoring procedures or in its disclosure requirements. This is particularly so because it is a one-time test, with advance notice and with no random testing component, and because the school system in which the employees work is heavily regulated, particularly as to drug usage.

Therefore, we **REVERSE** the District Court's finding this portion of the statute unconstitutional.

### B. Suspicion–Based Testing

The Court now turns to the suspicion-based testing, and finds that this portion of the Policy is also constitutional under the Fourth Amendment.

#### 1. Drug Testing

The Policy provides for testing of an employee if the Director of Personnel "reasonably suspects" that an employee's work performance or on-the-job behavior may have been affected by illegal drugs or alcohol. The Policy further enumerates the circumstances under which substance screening

may be considered, which include, but are not limited to, the following:

 1. Observed use, possession, or sale of illegal drugs and/or use, possession, sale, or abuse of alcohol and/or the illegal use or sale of prescription drugs.

 2. Apparent physical state of impairment of motor functions.

 3. Marked changes in personal behavior not attributable to other factors.

 4. Employee involvement in or contribution to an accident where the use of alcohol or drugs is reasonably suspected or employee involvement in a pattern of repetitive accidents, whether or not they involve actual or potential injury.

 5. Violations of criminal drug law statutes involving the use of illegal drugs, alcohol, or prescription drugs and/or violations of drug statutes.

(J.A. 1011). These requirements of "reasonable cause" sufficiently limit the discretion of the officials administering the rule and, because the testing is clearly based upon a finding of individualized suspicion, this portion of the Policy comports with the reasonableness requirement of the Fourth Amendment. Thus, for these reasons and those identified by the District Court, we **AFFIRM** the District Court's ruling on this aspect of the suspicion-based testing program.

### 2. Alcohol Testing

However, the District Court did find one portion of the suspicion-based test unconstitutional. The District Court ruled that the Policy's alcohol testing procedures violated the Fourth Amendment for three reasons: (1) the Policy itself provides that the initial breathalyzer test be carried out by the Knox County Sheriff's Department, thereby implicating serious privacy concerns as the results would instantaneously be in the hands of law enforcement personnel; (2) the Policy did not require compliance with the extensive procedural rules that the Department of Transportation requires regarding ensuring the accuracy of test results; and (3) the alcohol content required for a positive result was so low (.02) that it might easily return a

positive result based solely on legal, off-duty ingestion of alcohol.

The Policy's requirement that the breathalyzer test be carried out by law enforcement personnel does implicate serious privacy concerns. The problem with having law enforcement officers administer the test is that they will have immediate access to the results. This publication converts the testing from a matter peculiarly within the scope of the employment relationship to one which directly involves law enforcement authorities. Therefore, in contrast to the other portions of the test which only require disclosure to the MRO in the first instance, the disclosure of the alcohol testing results are much broader, thereby leading to a higher degree of intrusiveness.

However, as noted earlier, testimony at trial indicated that Defendant no longer conducts its alcohol testing through the Sheriff's office but through its own personnel, trained and certified in the operation of the breathalyzer. Thus, as a practical matter, the privacy concerns implicated by this additional disclosure no longer exist. We recognize, as the District Court did, that the fact that the language in the Policy requires the testing to be carried out by law enforcement officials makes it possible for the Board to revert to this method, causing an unnecessary invasion of the employee's privacy. But, the mere possibility of this encroachment does not factor heavily in the Court analysis.[28]

A second issue is whether the alcohol testing procedures lack many of the safeguards necessary to insure the accuracy of the breathalyzer machine, and the appropriateness of the testing protocol. Plaintiff claims that, in marked contrast to the DOT regulations, the Policy does not contain detailed guidelines regarding the administration of the breathalyzer test, including training required for individuals who administer breathalyzers (49 C.F.R. Pt. 40.51), standards for machines that may be used for breathalyzers (49 C.F.R. Pt. 40.53), calibration standards for breathalyzer machines (49 C.F.R. Pt. 40.55), standards to insure the visual and

---

**28.** Indeed, it seems unlikely, especially in light of the Court's admonition here, that the Board

would revert to having law enforcement officials conduct the test.

aural privacy of individuals subjected to breathalyzers (49 C.F.R. Pt. 40.63), and standards for administering confirmation tests (49 C.F.R. Pt. 40.65).

■ It may well be that the Policy is deficient in this regard, i.e., it does not provide all the safeguards that the DOT Procedures do regarding breathalyzer tests. But, this aspect of the test, by itself, is not defective enough to engender constitutional concerns. The alcohol testing procedures set out in the Policy state that if a breath analysis test is positive, a second breath analysis test must be taken. (J.A. 1018). In the event of a positive reading, a urine test will be administered. The alcohol urinalysis will be an EMIT screen followed by confirmatory gas chromatography tests on positive screens. Either test will be considered positive if the results are .04 or more. Regarding urine collection and testing, the Policy specifically states that the lab "will follow the Department of Transportation Procedures for preparation for testing, chain of custody, security, privacy, integrity, and identity of specimen, and any necessary transportation to a laboratory. See 49 C.F.R. Part 40 § 40.23 and 40.25." (J.A. 1018). *See also,* J.A. 1017 ("Specimens will be collected in accordance with Department of Transportation Procedures for Transportation Workplace Drug Testing Programs 49 C.F.R. Part 40 which are incorporated herein by reference, with exceptions as noted in this Policy."). Thus, as to this aspect, there are sufficient safeguards.

■ However, while the exact procedures employed during the alcohol testing do not themselves render the test unconstitutional, the Policy's low threshold (.02) for a positive result does call into question the constitutionality of that portion of the test. The District Court noted that the .02 level is one-fifth the statutory level which would constitute driving under the influence of alcohol in Tennessee, *see* T.C.A. § 55–10–401(a)(2), and concluded that the level was "so low that it might easily return a positive result based solely on legal, off-duty ingestion of alcohol." (J.A. 63).

■ Based on the record before us, the Court is unable to make a determination as to whether this portion of the test is constitutional. For a search to be reasonable under the Fourth Amendment, it must be "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *See also, Rutherford v. Albuquerque,* 77 F.3d 1258, 1263 (10th Cir.1996) (finding drug testing unreasonable in part because it screened for off-duty drug use which was wholly unrelated to employer's asserted interest in on the job safety); *National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 974 (D.C.Cir.1990) (finding reasonable suspicion drug testing program unreasonable that tested non-safety sensitive employees for off-duty drug use). As the District Court noted, the record does not contain any evidence regarding whether the broad range of the alcohol testing and particularly the low threshold is reasonably related to the purpose of the testing, nor does it indicate the amount and timing of consumption that would result in that low level reading. Therefore, it is unclear from the record why the Board believes impairment at the relatively low .02 level is significant, and how that level is related to the purpose of the testing. It may be that there is no such nexus and, if this is so, this portion of the Policy is indeed unconstitutional. However, we cannot conclude that from this record (just as we cannot conclude that there is some relationship between the nature of the test and levels established and the identified need for testing). Therefore, the issue of whether this portion of the test is constitutional is **REVERSED AND REMANDED** to the District Court to determine whether the .02 level is reasonably related to the purpose of the testing.

## VII. CONCLUSION

Therefore, for the reasons stated,

The District Court's ruling as to the suspicionless testing portion of the Policy is **REVERSED.** The District Court's ruling as to the suspicion-based portion of the Policy is **AFFIRMED,** except regarding the issue of whether the alcohol testing is constitutional, which is **REVERSED AND REMANDED**

for proceedings not inconsistent with this opinion.

