Carol **CRAGER**, Plaintiff,

v.

**BOARD OF EDUCATION OF KNOTT COUNTY, KENTUCKY, et al., Defendants.**

**No. CIV.A. 7:04–155–DCR.**

United States District Court, E.D. Kentucky, Pikeville Division.

April 8, 2004.

Arthur L. Brooks, Brooks, McComb, Fields, Ruble & Mullins, James Follace Fields, II, Brooks, McComb, Fields, Ruble & Mullins, Lexington, KY, for Carol Crager, Plaintiff.

Robert L. Chenoweth, Chenoweth Law Office, Frankfort, Ronald G. Combs, Gullett, Combs, Reed & Bowling, Hazard, KY, for Board of Education of Knott County Kentucky, Harold Combs, Individually, Defendants.

## MEMORANDUM OPINION AND ORDER

REEVES, District Judge.

The Knott County Board of Education ("Board") operates nine public schools in Knott County, Kentucky. Knott County is located in an area of Eastern Kentucky which has experienced a serious problem with prescription drug abuse, as well as other illegal substances, such as marijuana, cocaine and methamphetamine. Some of the actions taken by state, local, and federal officials to combat this growing epidemic are discussed herein. In addition, the Board has taken steps to address this problem within its schools.

Prior to January 2004, the Board adopted a suspicion-based method of drug testing for its teachers. However, being mindful of the area's problem, the system's administrators decided to take a slightly different approach to meet its goal of having a drug-free school system. Under this new approach, 25% of all employees considered to be in "safety-sensitive" positions will be randomly-selected for testing without regard to suspicion of illegal drug use.

Plaintiff Carol Crager ("Crager") is a tenured teacher employed by the Board. On March 25, 2004, Crager filed the present action seeking to enjoin the Board's current drug testing policy. On the day suit was filed, Crager sought and obtained

an agreement with the Board that it would suspend certain testing activities until a hearing could be held concerning her request for a preliminary injunction. The Court subsequently entered an agreed order to that effect. [Record No. 5] The Court then scheduled a hearing on the Plaintiff's request for a preliminary injunction for April 6, 2004. Defendant Harold Combs ("Combs"), Superintendent of Knott County Schools, was the only witness called to testify at the hearing.[1]

After hearing testimony and considering other evidence and arguments concerning the issues raised by Crager's pleadings, the Court is convinced that the drug testing policy and procedures adopted by the Board do not violate Crager's Fourth Amendment rights prohibiting unreasonable searches and seizures. Further, the Board's policies and procedures do not violate the Americans with Disabilities Act ("ADA"). Accordingly, Crager's motion for a preliminary injunction [Record No. 2] will be denied and the temporary relief previously issued by agreement of the parties will be vacated and set aside.

### I. BACKGROUND

Crager is a tenured teacher with 14 years of experience with the Knott County school system. She currently teaches at Hindman Elementary School in Knott County. On January 15, 2004, the Knott County Board of Education adopted a "Drug–Free / Alcohol–Free Schools" policy ("Knott policy") [Record No. 2, Ex. 1]. The Knott policy calls for random, suspicionless drug testing of employees in "safety sensitive" positions. In conjunction with this policy, Knott County entered into an

agreement on March 18, 2004, with On–Site Drug Screens ("OSDS"), outsourcing the testing duties to OSDS and setting forth the relevant policies and procedures for testing.[2]

### II. LEGAL STANDARD FOR INJUNCTIVE RELIEF

In *In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir.1985), the Sixth Circuit set forth the relevant considerations for examining a motion for a preliminary injunction. There are four relevant factors: (1) the likelihood of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *Id.* at 1228. As the Sixth Circuit has noted most recently in *Chabad of Southern Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427 (6th Cir.2004), when ruling on a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the district court must consider and balance these four factors. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *DeLorean* at 1229.

■ If Crager can demonstrate that her Fourth Amendment rights are being violated, she will have likewise demonstrated irreparable injury. *Cf. Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Simply *pleading* a constitutional violation, however, does not

---

1. Although Crager attended the hearing, she was not called as a witness by either side. Notwithstanding this fact, the sworn materials filed in support of her position has been considered by the Court.

2. As the Court has noted previously, the district utilized a suspicion-based testing program prior to January 2004. Testing under the new suspicionless policy commenced this semester but was suspended when the parties tendered the agreed temporary restraining order.

obviate the need to analyze all four of the *DeLorean* criteria. Likewise, simply claiming that a constitutional violation has occurred does not entitle a party to the relief sought.

## III. LEGAL ANALYSIS

### A. *Fourth Amendment Claim*

#### 1. Suspicionless Testing

■ There is no general Fourth Amendment prohibition against suspicionless and random drug testing. Generally, the state requires an "individualized suspicion" before performing a drug test. However, case law affirms "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Employee's Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). An exception arises when there are "special needs," *i.e.*, concerns other than crime detection, in which "the privacy interests implicated by the search are minimal, and where an important governmental interests furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion ...." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

■ Special needs can arise when the job being tested is "safety sensitive," meaning that the job involves "discharge of duties fraught with risks of injury to others [such] that even a momentary lapse of attention can have disastrous consequences." *Id.* at 628, 109 S.Ct. 1402. In these cases, the court must "balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. 1384. The Court's balancing analysis must be context-specific. *Chandler v. Miller*, 520 U.S. 305, 314, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

In *Knox County Educ. Assoc. v. Knox County Bd. of Educ.*, 158 F.3d 361 (6th Cir.1998), the Sixth Circuit upheld a drug testing policy that provided for the suspicionless testing of teachers, finding that teachers and school administrators occupied "safety sensitive" positions. The Knox County testing policy provided two types of testing: (1) a suspicionless test for those in "safety sensitive" positions, including principals, assistant principals, teachers, traveling teachers, teacher aides, substitute teachers, school secretaries and school bus drivers,[3] and (2) reasonable suspicion testing for any employee that displayed reasonable suspicion that they were violating the drug policy. *Id.* at 366–68. Knox County's suspicionless test was performed on (1) all applicants for safety sensitive positions, (2) those transferring into safety sensitive positions, and (3) those already in safety sensitive positions. *Id.* at 366–67. The *Knox* court provided a compelling public policy rationale for its holding that suspicionless testing did not violate the Fourth Amendment, noting that:

> [w]e can imagine few governmental interests more important to a community than that of insuring the safety and security of its children while they are entrusted to the care of teachers and administrators. Concomitant with this governmental interest is the community's interest in reasonably insuring that

---

**3.** This list is nearly identical to the list of "safety sensitive" employees in the Knott policy.

cy.

those who are entrusted with the care of our children will not be inclined to influence children—either directly or by example—in the direction of illegal and dangerous activities which undermine values which parents attempt to instill in children in the home. Indeed, teachers occupy a singularly critical and unique role in our society in that for a great portion of a child's life, they occupy a position of immense direct influence on a child, with the potential for both good and bad. Teachers and administrators are not simply role models for children (although we would certainly hope they would be that). Through their own conduct and daily direct interaction with children, they influence and mold the perceptions, and thoughts and values of children. Teachers and administrators are not some distant societal role models, . . . rather, on a daily basis, there is a direct nexus between the jobs of teachers and administrators and the influence they exert upon the children who are in their charge. Indeed, directly influencing children is their job.

*Id.* at 374–75; *see also Chandler,* 520 U.S. at 316, 117 S.Ct. 1295 ("a local government bears large responsibilities, under a public school system, as guardian and tutor of children entrusted to its care") (citation omitted). The Sixth Circuit determined that given their status, their job responsibilities, their diminished expectation of privacy, and the highly regulated nature of their profession, suspicionless drug testing of teachers is not an unreasonable search under the Fourth Amendment.

In finding that teachers had a decreased expectation of privacy, the *Knox* court held that teachers in Tennessee were "heavily regulated." The court found it noteworthy that Tennessee: required teachers to report student offenses, T.C.A. § 49–6–4301(a); set forth the duties, responsibilities, certification, qualification and licensing requirements for

teachers, T.C.A. § 49–5–101; set forth the reasons a tenured teacher may be dismissed, T.C.A. § 49–5–501(3)(E); and established the teacher's status as acting "in loco parentis," T.C.A. § 49–6–4203(b). *Knox County,* 158 F.3d at 383–84. Similarly, Kentucky: requires that certain student offenses be reported to law enforcement, K.R.S. § 158.154; sets forth the duties, responsibilities, certification, qualification and licensing requirements for teachers, K.R.S. §§ 161.020—161.030 and sets forth the reasons a tenured teacher may be dismissed, K.R.S. §§ 161.790, 161.800. While Kentucky has not enacted an "in loco parentis" statute, Kentucky courts have recognized teachers' in loco parentis status. *See Casey County Bd. of Educ. v. Luster,* 282 S.W.2d 333, 334 (Ky. 1955) (noting that teachers generally stand in loco parentis to their students). Kentucky additionally requires teachers and administrators to supervise student conduct at school, on the way to and from school, and on school-sponsored trips. K.R.S. § 161.180. Thus, teachers in Kentucky are "heavily regulated," as in Tennessee and, therefore, "when people enter the education profession [in Kentucky,] they do so with the understanding that the profession is heavily regulated as to the conduct expected of people in that field, as well as the responsibilities that they undertake toward students and colleagues in the schools," *Knox County,* 158 F.3d at 384, thus lessening their expectation of privacy.

■ Crager argues that Knott County must first demonstrate a drug problem among Knott County teachers to justify a suspicionless testing regime. In *Knox County,* however, the Sixth Circuit noted that such a finding was not a prerequisite to establishing a suspicionless testing policy, noting that:

in this case, there is little, if any, evidence of a pronounced drug or alcohol abuse problem among Knox County's teachers or other professional employees. Specifically, there is no empirical or historical evidence of an ongoing abuse problem (as in *Skinner*) or evidence of a newly blossoming epidemic of abuse (as in *Vernonia*). In fact, since the Policy was implemented in 1989, only one prospective hire has failed the suspicionless test.

*Knox County*, 158 F.3d at 374. The Court further noted that "the existence of a pronounced drug problem is not a *sine qua non* for a constitutional suspicionless drug testing program." *Id.*

Regardless of the clear holding in *Knox County* that a school board need not demonstrate a pronounced drug problem, there is evidence of a drug problem in the Knott County area and, to a more limited extent, in the school system. Combs testified regarding approximately seven incidents of suspected drug abuse among the staff and faculty during his eight-year tenure as Superintendent (a significant number for such a small school system). Further, Knott County referenced evidence regarding the extensive drug problem in Eastern Kentucky, particularly in Knott County. Indeed, as a local paper reported:

> Eastern Kentucky is the prescription-painkiller capital of the United States, a place where narcotics such as OxyContin and Vicodin pour in at much higher rates than in Miami, Detroit or Los Angeles. Nearly half a ton of narcotics reached parts of seven small mountain counties [including Knott County] from 1998 to 2001—the equivalent of more than 3,000 milligrams for every adult who lives there.... In an analysis of federal data, the Herald–Leader found that, on a per capita basis, Eastern Kentucky drugstores, hospitals and other

legal outlets received more prescription painkillers than anywhere else in the nation.

Linda Johnson, *Eastern Kentucky: Painkiller Capital*, Lexington Herald–Leader, Jan. 19, 2003, at A1.

The Court also takes judicial notice that Knott County has been designated as part of the federal government's "High–Intensity Drug Trafficking Area" program, established "in areas where major drug production, manufacturing, importation, or distribution flourish." The High–Intensity Drug Trafficking Area Program: An Overview, *available at* www.whitehouse drugpolicy.gov/hidta/frames_overview. html. The Court also takes judicial notice that a joint state-federal task force, named "Operation UNITE [4]," with approximately $16 million in federal funding to date, has been established to combat the drug problem in Eastern Kentucky. Alan Maimon, *More Unity Pledged in Anti–Drug Battle*, Louisville Courier–Journal, Jan. 22, 2004, at 1B.

Tellingly, on the day of the hearing on the Plaintiff's request for a preliminary injunction, an Operation UNITE drug bust resulted in one of Kentucky's largest drug stings in history, netting 211 suspects in Eastern Kentucky and resulting in the confiscation of more than 1,700 prescription pills and at least $34,000 in drug money. Alan Maimon, *Police Seek Hundreds in Drug Crackdown*, Louisville Courier–Journal, April 7, 2004, at 1A. Finally, the undersigned notes his personal experience with the significant drug problem in Eastern Kentucky, evidenced by the substantial volume of drug cases that comprise the criminal docket for this Court (Pikeville and London Divisions).

In addition to the significant evidence of the drug abuse in Eastern Kentucky and

4. UNITE stands for "Unlawful Narcotics Investigation Treatment and Education."

Knott County, the *Knox* court also noted the general prevalence of drug use among the nation's youth in justifying suspicion-less testing. *Knox County*, 158 F.3d at 375, n. 12. Thus, although not required to do so by the holding in *Knox County*, Knott County has established the existence of a drug problem in its schools and community. Given the high concentration of drugs in Knott County, it is reasonable to assume that drugs represent an imminent threat to the students and faculty in the Knott County school district.[5]

Crager seeks to distinguish the holding in *Knox County* by suggesting that the teachers in the Knott County school system are less isolated than the teachers in *Knox County*, relying on some wording found in the *Chandler* case. In *Chandler*, the Supreme Court struck down a Georgia statute that required candidates for "high office" to submit to a drug test before having their names placed on the ballot. One of the reasons the court disavowed Georgia's testing regime was that public officials undergo relentless scrutiny and are subject to attention "notably beyond the norm in ordinary work environments." *Chandler*, 520 U.S. at 322, 117 S.Ct. 1295. Thus, the *Chandler* court concluded that those in "high office" had less need for testing because their conduct could be easily observed.

In distinguishing *Chandler*, the *Knox County* court noted that teachers "spend most of their days (about 6 hours) in the solitude of their classrooms surrounded only by students, some of whom are very young, who may or may not be able to detect drug use among teachers." 158 F.3d at 375. During the April 6th hearing, Crager elicited testimony from Combs stating that many Knott County classrooms had more than one teacher in the classroom and that most teachers dealt with multiple groups of students in a given day. Regardless, it is equally clear that some teachers spend their day mostly isolated from other faculty. Simply because a teacher works with multiple groups of students does not make it more likely that students will be able to detect (or will feel safe reporting), drug use by their teachers.

A further distinguishing factor is that, unlike politicians in "high office" in Georgia, whose conduct attracts "relentless scrutiny" and "attention notably beyond the norm," teachers certainly do not attract such intense scrutiny, even in classrooms with another teacher. It is cavalier to suggest that simply having another teacher in a classroom provides an adequate safeguard to ensure that a teacher is not under the influence of drugs. In overcrowded classrooms with energetic children, it would hardly be surprising to conclude that a teacher would not pay much attention to the other teacher in his classroom but would instead pay attention to the students with whom he or she is working. Other factors (such as tenured versus non-tenured status) may make it equally difficult to report suspected drug use or abuse among peers.

Moreover, the holding in *Chandler* was based largely on other considerations, including the court's conclusions that: (1)

---

**5.** It should not be inferred that the students of Knott County are doomed to failure as a result of the drug epidemic in the area. Notwithstanding this problem in Knott and other eastern Kentucky counties, students from the Knott County system are highly competitive and successful in state and regional academic contests. For example, the Court notes that Knott County Central High School recently won first place in the Kentucky High School Speech and Debate Tournament. Ironically, the report of this victory which appeared in the Community section of the April 7, 2004, Lexington Herald Leader was overshadowed by the drug roundup performed through operation UNITE which received front page coverage in the same edition.

the non-random nature of the drug test would catch few users, 520 U.S. at 319–20, 117 S.Ct. 1295, and (2) testing candidates for office does not involve a "high-risk" or "safety-sensitive" setting, such as exists in the transportation and school settings, *Id.* at 316, 319, 322–23, 117 S.Ct. 1295. Indeed, in further distinguishing *Chandler,* the *Knox* court noted that "unlike candidates for public office who may indirectly affect the lives of children as role models and policymakers, teachers directly influence and supervise children daily." *Knox County,* 158 F.3d at 375. Thus, in addition to the fact that the teachers in Knott County are subject to significantly less scrutiny than politicians in high offices, there are numerous other factors distinguishing these two professions.

Crager argues that Knott County could accomplish its goals by maintaining the previous suspicion-based testing, a supposedly less-intrusive invasion of privacy. Suspicion-based testing is insufficient due largely to the autonomy of teachers, often working in isolated classrooms, as discussed *supra.* It puts too heavy a burden on students and teachers (in those classrooms with multiple teachers) to not only spot teachers who are operating under the effect of drugs, but also to report those teachers. For children, it means turning in their authority figure and mentor—an awesome responsibility for a child. For teachers working with other teachers in the same classroom, it means turning in a co-worker, with possibly disastrous personal consequences if the teacher ends up testing negative.

The only remaining alternative to spot those displaying "reasonable suspicion" are the administrators. Administrators, however, have far too many teachers and children to watch over during the school day to observe all of the teachers to ensure that they are not "under the influence." Combs testified that principals are often so swamped with the numerous behavioral and bureaucratic issues that arise on a normal day that they cannot even walk the halls at class changes, as they are supposed to do to ensure order. It is too much to ask these over-worked administrators to also act as watchmen to ensure that all of the employees under their supervision are substance-free.

The *Knox Court* explicitly affirmed the right of school district's to conduct suspicionless testing. Further, in *Skinner,* the Supreme Court noted that "[a] requirement of particularized suspicion of drug or alcohol use would seriously impede an employer's ability to obtain [information of drug abuse], despite its obvious importance." 489 U.S. at 631, 109 S.Ct. 1402. The *Skinner* court also pointed out that courts should not conduct a "no less restrictive alternatives" analysis, noting that "the logic of . . . elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers, because judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished." *Id.* at 629 n. 9, 109 S.Ct. 1402 (citations omitted).

Thus, the holdings in *Knox County* and *Skinner,* as well as the benefits of suspicionless testing to the state and the significant drug problem facing Knott County, support the Board's right to conduct suspicionless testing.

2. Testing & Confidentiality Procedures

██ In upholding drug testing policies, courts have traditionally required those policies to set forth adequate safeguards to ensure reliability, privacy during testing, and confidentiality of results. Such safeguards are particularly necessary given

the dearth of intimate medical details that can be obtained through blood and urine tests. In *Bd. of Educ. of Ind. School Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 832–33, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), the Supreme Court upheld the testing of students engaged in competitive, extracurricular programs. The testing policy required students to provide a urine sample in a private stall. In addition, the policy included safeguards to prevent leaking the tester's medical information. *Id.* at 833, 122 S.Ct. 2559.

The testing policy in *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 650, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), stated that males could provide urine samples with their backs to a monitor, while requiring girls to produce their samples in a private stall. The samples were sent to an independent testing laboratory which produced results that were 99.94% accurate. *Id.* at 651, 115 S.Ct. 2386. The school district followed "strict procedures regarding chain of custody and access to test results." *Id.* Likewise, in *Von Raab,* the policy allowed the tester to produce the sample behind a partition or in a private stall. 489 U.S. at 661. It further provided that a tamper-proof custody seal was placed on the container along with the test subject's identification number. *Id.* The sample was placed in a plastic bag, sealed and submitted to the lab for testing. *Id.* The lab utilized both the Enzyme–Multiplied Immunoassay Technique and the gas chromatography/mass spectrometry methods of testing and provided that positive results were reviewed by a qualified physician, taking into account the test subject's "medical history and any other relevant biomedical information." *Id.* at 662, 109 S.Ct. 1384 (citations omitted).

Finally, in *Knox County,* the Sixth Circuit upheld a testing policy that was implemented by a physician who, upon a positive result, conducted an interview with the test subject, reviewed their medical history and files, reviewed the drug test results, and could order re-tests. 158 F.3d at 368. As in *Von Raab,* the policy utilized both the Enzyme–Multiplied Immunoassay Technique and the gas chromatography/mass spectrometry methods of testing. *Id.* To ensure privacy, the policy provided that the doctor in charge of the program would maintain the records in private, disclosing them only to the Director of Personnel to the extent necessary to address work-related safety risks due to drug or alcohol use, and further provided that:

> [a]ll personnel records and information regarding referral, evaluation, substance screen results, and treatment are to be maintained in a confidential manner and no entries concerning such will be placed in the employee's personnel file. In effect, two separate files will be maintained: one with the [doctor] indicating the results of the substance abuse tests and another maintained as part of the employee's personnel record.

*Id.* at 369. Further, the urine samples were provided in private, unless the school board had reasonable suspicion that a tester was altering the results. *Id.* at 368.

The Secretary of Transportation has likewise promulgated a drug testing policy for employees of the Department of Transportation. 49 C.F.R. Part 40. These regulations, while containing greater detail than is necessary for most employers, provide a useful reference for the relevant considerations when seeking to ensure accurate and confidential drug testing. The regulations discuss, *inter alia,* the training requirements for specimen collectors, 49 C.F.R. § 40.33; the privacy of the collection process, 49 C.F.R. § 40.41; the requisite steps for preserving the chain of custody, 49 C.F.R. § 40.43; the collection process itself, 49 C.F.R. §§ 40.63, 40.67, 40.69; the laboratory test-

ing requirements, 49 C.F.R. §§ 40.81, 40.83, 40.85, 40.87; the process for review by the medial review officer, 49 C.F.R. §§ 40.121, 40.123, 40.129; and how to deal with the common problems encountered while administering drug tests, 49 C.F.R. §§ 40.191, 40.209. The Knott County policies contain significant similarities with the policies found in 49 C.F.R. Part 40. In fact, the policy specifies that "[a]ll collections meet the Federal DOT guidelines to fulfill the Part 40 urine collectors' requirements." (OSDS Policy & Procedures Manual at 3).

Knott County has outsourced their testing to OSDS, a private company specializing in drug testing. The company tests for cocaine, marijuana, opiates, amphetamines, methamphetamines, benzodiazepines, tricyclics, anti-depressants, barbiturates, and methadone. (Drug Testing Agreement at 2). Combs testified that the district determined that these drugs were particularly problematic in Knott County. The agreement provides that the testing is overseen by a Medical Review Officer ("MRO"), as in *Knox County*, and provided for in 49 C.F.R. § 40.121. (Drug Testing Agreement at 1). The agreement identifies Dr. Michael Cloyd as the MRO and notes that he is board certified in toxicology and substance abuse testing and has ten years experience in test interpretation. (OSDS Policy & Procedures Manual at 7). The policy requires that the testers maintain the chain of custody and provides that the Federal Drug Testing Custody and Control Form will be used. (Drug Testing Agreement at 2, OSDS Policy & Procedures Manual at 2).

The Agreement further provides that testing is performed in a private room, unless the test administrator has reason to suspect tampering. (OSDS Policy & Procedures Manual at 5–6). If tampering is suspected, an observer (of the same sex) will monitor the test subject during urination. (OSDS Policy & Procedures Manual at 6). The lab utilizes the computerized gas chromography / mass spectrometry method of testing (OSDS Policy & Procedures Manual at 2) and testing is only performed by Health and Human Services and National Laboratory Certification Program certified labs (OSDS Policy & Procedures Manual at 7). Following two positive tests, the MRO consults the test subject and, with the subject's permission, their physician. (OSDS Policy & Procedures Manual at 7, 10). The MRO then makes a determination as to whether the positive test is due to a legitimate, medical reason. (OSDS Policy & Procedures Manual at 7). If it is not, the result is reported as "positive."

To ensure confidentiality, the Testing Agreement provides that:

> the parties agree[ ] that is [sic] shall not disclose or divulge any information pertaining to the testing results to any third party (excluding MRO or the test subject) without written authorization from the other party unless court ordered to do so. Each party further agrees that confidential information obtained by either party in the course of this agreement may be used by that party for its own benefit and purposes.

(Drug Testing Agreement at 2).

During the April 6th hearing, Combs testified that communication between OSDS and himself was conducted through a dedicated fax machine located in his office. He maintains the medical records in a file separate from the personnel files, kept in a locked, fire-proof safe in his office. He further testified that his office is almost always locked and he is the only person with the key. He personally relays the results of positive tests to the employee. Negative test results are sometimes relayed to teachers via email or phone, when requested by the employee. Thus,

consent is obtained before sending results in this manner.

Based on the safeguards discussed herein, the Court finds that the Knott policy comports with the Chapter 49 of the Code of Federal Regulations and the testing policies[6] that were upheld in the relevant case law, as discussed *supra.* These safeguards provide significant protections which are constitutionally permissible.

### 3. Release of Information to Law Enforcement

The Knott policy provides that "violations shall result in notification of appropriate legal officials." In the other leading cases on drug testing, the Supreme Court has specifically noted that under those policies the test results were not released to law enforcement. *Earls,* 536 U.S. at 833, 122 S.Ct. 2559; *Chandler,* 520 U.S. at 312, 117 S.Ct. 1295; *Von Raab,* 489 U.S. at 663, 109 S.Ct. 1384; *cf. Vernonia,* 515 U.S. at 651, 115 S.Ct. 2386 (noting that only the superintendent, principals, vice-principals and athletic directors have access to test results and not discussing any release of the information to law enforcement); *Knox County,* 158 F.3d at 369, 384 (noting that only the reviewing doctor and the Director of Personnel will know the results and that the policy is narrowly-tailored in its disclosure requirements). In *Earls,* the Supreme Court held that "given the minimally intrusive nature of the sample collection and *the limited uses to which the test results are put,* we conclude that the invasion of students' privacy is not significant." *Earls,* 536 U.S. at 834, 122 S.Ct. 2559 (emphasis added). Thus, it appears that the Supreme Court considers the potential release of test information to law enforcement a relevant factor, weighing against the constitutionality of the testing regime.

During the April 6th hearing, Combs testified that the term "legal officials" in the Knott policy referred to the Educational Professional Standards Board (to whom the school district is required to report instances of misconduct) rather than law enforcement. Crager, however, points out that Knott County could later change this interpretation. Changing the interpretation, however, would be inconsistent with the policies adopted by Knott County, which work to ensure complete confidentiality. Further, Combs testified that the school board had entered into "a lot of discussion" on whether to report results to law enforcement, but had abandoned the idea before drafting the Knott policy and did not intend for the policy to encompass a law enforcement reporting provision. The Knott policy, therefore, does not envision the reporting of test results to law enforcement.

While the ambiguity is understandable, based on all evidence and testimony presented, the Court concludes that the Knott policy refers to the Educational Professional Standard Board when it refers to "legal officials," rather than law enforcement. Therefore, this part of the policy does not implicate additional privacy concerns which would result in a Fourth Amendment violation.

### 4. Random Testing

As previously discussed, the Knott policy now imposes a random testing regime. In affirming the Knox County policy, however, the Sixth Circuit noted that a provision for random testing would weigh

---

**6.** Although Crager complains that she did not receive a copy of the procedures adopted by the Board, the Court finds that this was due to her failure to request a copy of them. According to Combs, although not finalized at the time of his meetings, he personally discussed and described the procedures during meetings at all schools within the district. Crager did not attempt to rebut this testimony.

against the constitutionality of a drug testing policy. *Knox County,* 158 F.3d at 384. This dicta in *Knox County,* however, does not necessarily mean that a random testing regime would be overly intrusive.

The Supreme Court has upheld the random drug testing of students. *Earls,* 536 U.S. at 826, 122 S.Ct. 2559 (testing students who participate in competitive, extracurricular activities); *Vernonia,* 515 U.S. at 650, 115 S.Ct. 2386 (testing student-athletes). The testing policies in *Chandler, Von Raab,* and *Skinner,* however, did not include an explicit random testing component. *Chandler,* 520 U.S. at 309–10, 117 S.Ct. 1295 (testing candidates for certain "high offices" in state government); *Von Raab,* 489 U.S. at 660–61, 109 S.Ct. 1384 (testing federal customs employees involved in drug enforcement, those who carried guns, or those who handled "classified materials," although noting that testing at unpredictable times was beneficial, as discussed *infra*); *Skinner,* 489 U.S. at 609–10, 109 S.Ct. 1402 (testing railroad employees involved in a train accident or based upon "reasonable suspicion"). While the Supreme Court has only upheld random testing in the context of student testing, nothing in the language of the cases provides an explicit prohibition against random testing of adults and the Supreme Court has never struck down a testing regime simply because it provided for random tests.

In fact, in *Skinner,* the Supreme Court implicitly advocated random testing, noting that drug tests following railroad accidents were very beneficial because employees were tested at random, unannounced times that they could not predict (and thus avoid detection). *Skinner,* 489 U.S. at 630, 109 S.Ct. 1402. As the court noted, "[b]y ensuring that employees in safety-sensitive

positions know they will be tested upon the occurrence of a triggering event, *the timing of which no employee can predict with certainty,* the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct." *Id.* (emphasis added). Thus, the *Skinner* court recognized the importance of testing that could not be predicted by the employee.

The only alternative to a random, suspicionless testing regime would be a one-time suspicionless test,[7] as in the *Knox County* case. In *Chandler,* the Supreme Court dealt with a one-time, suspicionless test. The court noted that Georgia's policy for one-time, suspicionless tests meant that "[t]he test date—to be scheduled [at the candidate's discretion]—is no secret. . . . [U]sers of illegal drugs, save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection." *Chandler,* 520 U.S. at 319–20, 117 S.Ct. 1295. In *Skinner,* the Court shared this concern that one-time tests would not provide a sufficient deterrent. 489 U.S. at 630, 109 S.Ct. 1402. While the Sixth Circuit's language in *Knox County* suggests it would be skeptical of the random testing of teachers, the Supreme Court has allowed such testing for students, has noted the futility of one-time, announced testing, and has never struck down a testing regime simply because it provided for random tests.

Moreover, the public policy behind testing teachers would be significantly enhanced by allowing random testing. In upholding the suspicionless testing of teachers, the *Knox* court stated that:

we do not read the definition of "safety-sensitive" so narrowly as to preclude application to a group of professionals

---

7. The Court has already held that the Board is entitled to conduct suspicionless tests, as discussed *supra.*

to whom we entrust young children for a prolonged period of time on a daily basis. Simple common sense and experience with life tells us that even a momentary lapse of attention can have disastrous consequences.

. . . . .

The Court believes that a local school district has a strong and abiding interest in requiring that teachers and other school officials be drug-free so that they can satisfy their statutory obligation to insure the safety and welfare of the children. ... We do not believe that the Board must wait passively for a disaster to occur before taking preemptive action to minimize the risks of [an accident caused by a teacher in an impaired condition].

. . . . .

Finally, we would be remiss if we did not point out that the safety sensitive nature of a teacher's or administrator's job is not limited to the necessity to act at the immediate time of a dangerous event. Rather, school personnel perform an essential monitoring role in preventing incidents from occurring in the first place. Teachers and administrators are in a unique position to observe children and learn if they are involved in activities which can lead to harm or injury to themselves or others. Clearly, if school personnel are themselves under the influence of, or involved in, drugs, their ability to perform this critical function is not only reduced, but they themselves are open to being compromised and undermined.

*Knox County,* 158 F.3d at 378–79 (citation omitted); *see also id.* at 374 ("We can imagine few governmental interests more important to a community than that of insuring the safety and security of its children while they are entrusted to the care of teachers and administrators.").

Random testing would significantly enhance the ability of the Board to ensure that its teachers, involved in an extremely important and "safety-sensitive" position, were drug-free. It also provides a significant deterrent effect and a practical method for catching drug users. A one-time test, administered at the start of employment or upon the passage of a drug-testing policy, would not do much to reduce the likelihood of drug use among teachers. It would not stop teachers from abusing drugs after their initial drug test and it would be easy for a current user to beat by temporarily suspending their drug use in order to pass the test, as noted by Justice Ginsburg in *Chandler.* The only people a one-time test would likely catch are those who are presently using and so addicted that they cannot stop, even temporarily, to pass a drug test.

The justifications for permitting the suspicionless drug testing of teachers (as discussed in *Knox County* ), the fact that random tests were upheld in *Earls* and *Vernonia,* the language in *Chandler* and *Skinner,* and the significant drug problem facing Knott County, support the right of the Board to protect its school children and employees through the use of random testing.

### B. *ADA Claim*

■■ Crager also claims that the drug-testing policy also violates the ADA, which provides, in relevant part, that: "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4). Drug testing is not a "medical exam" and the ADA explicitly states

that it does not prohibit the use of drug testing programs. 42 U.S.C. §§ 12114(b)-(d); *see also Consol. Edison Co. of New York,* 155 F.3d 150, 154–56 (2d Cir.1998). After reviewing the parties' pleadings and evaluating the evidence presented, the Court concludes that this claim is without merit.[8]

## IV. INJUNCTIVE ANALYSIS

As discussed *supra,* Crager has very little likelihood of success on the merits. Both Supreme Court and Sixth Circuit case law belie her argument that Knott County's drug testing policy violates the Fourth Amendment. Given her low likelihood of success, it is not necessary to conduct a thorough review of the remaining three *DeLorean* criteria. *Cf. DeLorean,* 755 F.2d at 1229 ("the degree of likelihood of success required may depend on the strength of the other factors").

However, in light of this Court's finding regarding Crager's low likelihood of success on the merits, it stands to reason that Crager will likewise not suffer irreparable injury if subjected to random drug testing. In addition, an injunction would harm the Knott County School District, including the students in that district. As the policy is designed to ensure that Knott County provides a drug-free environment for its employees and students in order to ensure a safer teaching and learning experience, enjoining the drug testing would harm the interests of both the students of Knott County and the Knott County school district. The suspicionless tests ensnare more users and have a greater deterrent effect, thus improving school safety. Similarly, public policy would not be served by extending the injunction. Indeed, Congress has adopted the Drug–Free Workplace Act, 41 U.S.C. § 702, requiring recipients of federal grant money (such as Knott County) to maintain a drug free workplace, indicating that public policy supports Knott County's attempt to ensure that its schools are drug free. As a federal funds recipient, the Board's policy of random drug testing furthers its interest in meeting the requirements of this Act.

## V. CONCLUSION

Accordingly, for the reasons discussed herein, it is hereby **ORDERED** that Crager's motion for a preliminary injunction [Record No. 2] is **DENIED** and the agreed temporary restraining order [Record No. 5] is **VACATED** and **SET ASIDE.**

---

8. At the hearing Crager did not put forth any arguments regarding her ADA claim.